# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-21-00294-CV

**Texas Telephone Association and Texas Statewide Telephone Cooperative, Inc., and Their Participating Members; Windstream Services, LLC; Texas Windstream, LLC (d/b/a Windstream Communications); Windstream Communications Kerrville, LLC (d/b/a Windstream Communications); Valor Telecommunications of Texas, LLC (d/b/a Windstream Communications Southwest); Windstream Sugar Land LLC; Central Telephone Company of Texas, Inc. (d/b/a CenturyLink); CenturyTel of Lake Dallas, Inc. (d/b/a CenturyLink); CenturyTel of Port Aransas, Inc. (d/b/a CenturyLink); CenturyTel of San Marcos, Inc. (d/b/a CenturyLink); and United Telephone Company of Texas, Inc. (d/b/a CenturyLink), Appellants**

**v.**

**Public Utility Commission of Texas; Peter Lake, Chairman; Will McAdams, Commissioner; Lori Cobos, Commissioner; and Jimmy Glotfelty, Commissioner, Each in His or Her Official Capacity at the Public Utility Commission of Texas, Appellees**

---

### FROM THE 200TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-21-000311, THE HONORABLE KARIN CRUMP, JUDGE PRESIDING

---

## O P I N I O N

This case concerns the Texas Universal Service Fund (TUSF), which was established by the Texas Legislature to achieve the policy goal of universal affordable telecommunications services across the state, and which the Legislature has directed the Public Utility Commission of Texas to fund and administer. The appellants, who are all rural telecom-service providers (collectively, "Rural Providers"), sued appellees when the Commission stopped

paying them the full amounts of TUSF support due to them under the Commission's orders.[1]  In this appeal, we consider whether the trial court erred by granting the combined plea to the jurisdiction and cross-motion for summary judgment filed by appellees, Public Utility Commission of Texas and its Commissioners (collectively, "PUC Parties"; individually, Commission and Commissioners).[2]  We conclude that the trial court erred by granting the combined plea and motion, except for its denial of mandamus relief related to Texas Government Code Section 2001.038, and that the suit filed by the Rural Providers should proceed.  We therefore affirm in part, reverse and render in part, and reverse and remand in part.

---

[1]  There are two separate groups of appellants.  Texas Telephone Association and its Participating Members and Texas Statewide Telephone Cooperative, Inc. and its Participating Members (collectively, the "Association Appellants"), two large associations of telecom providers, initially filed suit in the trial court.  The second group of appellants were included as participating members in the underlying lawsuit but filed a separate notice of appeal and separate briefing.  The second group consists of the following entities:  Windstream Services, LLC; Texas Windstream, LLC; Windstream Communications Kerrville, LLC; Valor Telecommunications of Texas, LLC (d/b/a Windstream Communications Southwest); Windstream Sugar Land LLC; Central Telephone Company of Texas, Inc. (d/b/a CenturyLink); CenturyTel of Lake Dallas, Inc. (d/b/a CenturyLink); CenturyTel of Port Aransas, Inc. (d/b/a CenturyLink); CenturyTel of San Marcos, Inc. (d/b/a CenturyLink); and United Telephone Company of Texas, Inc. (d/b/a CenturyLink) (collectively, the "Windstream and CenturyLink Appellants").  Except when it is necessary to refer to the separate groups individually because their appellate arguments diverge, the two groups are referred to in this opinion as the "Rural Providers."

[2]  In their operative petition, the Rural Providers named the following people as defendants in their official capacities: DeAnn T. Walker as Chairman, Arthur C. D'Andrea as Commissioner, and Shelly Botkin as Commissioner, each of the Public Utility Commission of Texas.  Because those former officials no longer hold those positions, we automatically substituted their successors as parties. *See* Tex. R. App. P. 7.2(a) ("When a public officer is a party in an official capacity to an appeal or original proceeding, and if that person ceases to hold office before the appeal or original proceeding is finally disposed of, the public officer's successor is automatically substituted as a party if appropriate.").  However, we will refer to the former commissioners by name when necessary to describe the actions taken by them.

# BACKGROUND

## The Texas Universal Service Fund

The underlying dispute involves the Commission's obligation to administer TUSF, which it funds through a surcharge to customers in order to subsidize affordable service for low-income and rural Texans. "Universal service—that is, 'adequate and efficient telecommunications service' available to all citizens at 'just, fair, and reasonable rates'—has long been a policy objective of our state and national governments." *In re Southwestern Bell Tel. Co., L.P.*, 235 S.W.3d 619, 621-22 (Tex. 2007) (quoting Tex. Util. Code § 52.001(a)); citing 47 U.S.C. § 151; *AT & T Commc'ns of Tex., L.P. v. Southwestern Bell Tel. Co.*, 186 S.W.3d 517, 521-22 n.18 (Tex. 2006)). To attain this policy goal, telephone rates historically have been set to enable "'the universal provision of affordable service to higher cost, rural areas of Texas, where the actual cost of providing service can exceed $100/month per line.'" *AT & T*, 186 S.W.3d at 521 n.18 (quoting Public Util. Comm'n of Tex., *Scope of Competition in Telecommunications Markets of Texas* at viii (Jan. 1999)). After the 1995 amendments to the Public Utility Regulatory Act (PURA), *see generally* Tex. Util. Code §§ 11.001-66.017, and the federal Telecommunications Act of 1996 opened local telephone exchange service to competition, the Texas Legislature substantially amended the universal-service subchapter of PURA in 1997.[3] *In re Southwestern Bell Tel.*, 235 S.W.3d at 622.

In the amended subchapter, the Legislature directed the Commission to "adopt and enforce rules . . . to establish a universal service fund" that is "funded by a statewide uniform charge payable by each telecommunications provider that has access to the customer base."

---

[3] *See* Act of May 8, 1997, 75th Leg., R.S., ch. 166 § 1, 1997 Tex. Gen. Laws 850.

Tex. Util. Code §§ 56.021, .022(a). By rule, each provider's portion of the statewide uniform charge (referred to as the provider's "assessment") is calculated by multiplying the assessment rate (a percentage approved by the Commission) by the provider's "monthly taxable actual intrastate telecommunications services receipts." 16 Tex. Admin. Code § 26.420(f)(3)(A) (2022) (Pub. Util. Comm'n of Tex., Administration of Texas Universal Service Fund (TUSF)); *see also id.* § 26.420(f)(4).[4] The telecommunications providers, in turn, may recover the amount of their assessment through a "Texas Universal Service" surcharge "assessed as a percentage of intrastate telecommunications services receipts on every retail customers' bill." 16 Tex. Admin. Code § 26.420(f)(6)(A)(ii). Thus, the customers' surcharge rate is the same percentage as the assessment rate that is determined by the Commission for providers.

To achieve the Legislature's policy goals of ensuring that "customers in all regions of this state, including low-income customers and customers in rural and high cost areas, have access to telecommunications and information services . . . that are reasonably comparable to those services provided in urban areas and that are available at prices that are reasonably comparable to prices charged for similar services in urban areas," Tex. Util. Code § 51.001(g), TUSF includes programs that provide financial support to assist telecommunications providers with supplying basic local services at reasonable rates in high-cost and rural areas, *see* 16 Tex. Admin. Code § 26.420(b)(1)-(2); *see also In re Southwestern Bell*, 235 S.W.3d at 622-23. While TUSF also includes programs for low-income or disability assistance[5] and programs for schools and library

---

[4] Rule citations are to the rules in effect in 2020, when the events at issue in this case occurred. All citations to Title 16 of the Texas Administrative Code are to rules promulgated by the Commission.

[5] *See* Tex. Util. Code § 56.021(2)-(3), (5)-(6) (9); 16 Tex. Admin Code §§ 26.412 (Lifeline Service Program), .414(e) (Telecommunications Relay Service (TRS)), .415 (Specialized Telecommunications Assistance Program (STAP)), .424 (Audio Newspaper Assistance Program).

assistance,[6] its programs for high-cost and rural assistance[7]—which are the ones at issue here—account for as much as 80% of the Fund's expenditures.

As part of the Commission's mandate to ensure "reasonable rates for basic local telecommunications service," PURA requires the Commission to "adopt eligibility criteria and review procedures, including a method for administrative review," that it "finds necessary" to fund TUSF and make distributions to eligible providers, Tex. Util. Code § 56.023(a)(1); to "determine which telecommunications providers meet the eligibility criteria," *id.* § 56.023(a)(2); and to "approve procedures for the collection and disbursal of the revenue of [TUSF]," *id.* § 56.023(a)(5). As directed by the Legislature, the Commission engaged in rulemaking procedures and promulgated rules to implement this mandate, and its rules now set forth how the TUSF monthly support amounts are determined for eligible providers. Initially, the TUSF monthly support amounts were set at certain levels with the potential for adjustments in subsequent proceedings, after notice and opportunity for hearing. *See, e.g.*, Tex. Util. Code § 56.023 (f), (g), (h), (i), (j); 16 Tex. Admin. Code §§ 26.403(e) (Texas High Cost Universal Service Plan (THCUSP)), .404(e) (Small and Rural Incumbent Local Exchange Company (ILEC) Universal Service Plan), .405 (Financial Need for Continued Support), .407 (Small and Rural Incumbent Local Exchange Company Universal Service Plan Support Adjustments). Thus, based on the Commission's rules,

---

[6] *See* Tex. Util. Code §§ 56.028, .253(a); 16 Tex. Admin Code § 26.410 (Universal Service Fund Reimbursement for Certain IntraLATA Service).

[7] *See* Tex. Util. Code § 56.021(1), (7)-(8); *id.* § 56.025; 16 Tex. Admin Code §§ 26.403 (Texas High Cost Universal Service Plan (THCUSP)), .404 (Small and Rural Incumbent Local Exchange Company (ILEC) Universal Service Plan), .406 (Implementation of the Public Utility Regulatory Act § 56.025), .408 (Additional Financial Assistance (AFA)), .421 (Designation of Eligible Telecommunications Providers to Provide Service to Uncertificated Areas), .422 (Subsequent Petitions for Service in Uncertificated Areas), .423 (High Cost Universal Service Plan for Uncertificated Areas where an Eligible Telecommunications Provider (ETP) Volunteers to Provide Basic Local Telecommunications Service).

each Rural Provider either has a frozen monthly support figure set by statute and rule or, more commonly, has undergone contested-case proceedings or other examinations resulting in a written order establishing its right to a specific monthly amount of TUSF funding, based on the provider's demonstrated financial need for continued support. *See, e.g.*, Tex. Util. Code §§ 56.023(f), (g), (h), (i), (j); 16 Tex. Admin. Code §§ 26.403(e), .404(e), (f), .405(e), .407(h), .408(d) (Additional Financial Assistance (AFA)), .423(e)(2) (High Cost Universal Service Plan for Uncertificated Areas where an Eligible Telecommunications Provider (ETP) Volunteers to Provide Basic Local Telecommunications Service). PURA and the Commission's rules provide that the monthly support amounts established by Commission orders are to be disbursed promptly by the TUSF administrator (currently Solix, Inc.) to the providers.[8] *See, e.g.*, Tex. Util. Code §§ 56.023(a)(1), (5), .026 (requiring disbursements from Fund to be made "promptly and efficiently"); 16 Tex. Admin. Code §§ 26.404(f), .420(d)(2)(D), .423(e). These Commission-ordered monthly support amounts constitute costs of TUSF programs that are used in calculating the amount of money needed to fund TUSF.

The issues at the heart of this lawsuit are whether the Commission is required to completely fund TUSF to enable full payment of the Commission-ordered support amounts and whether the Commissioners violated statutory and constitutional provisions and the Commission's own rules when they decided not to increase the assessment rate (and corresponding customer surcharge) to the percentage rate required to fully fund TUSF, knowing that it would dwindle to near-insolvency without the increase. The relevant Commission rule establishes that the TUSF administrator "shall determine, on a periodic basis, the amount needed to fund the TUSF" and

---

[8] The Commission contracts with Solix, Inc., a third-party vendor, to operate and administer TUSF.

6

"[t]he determined amount *shall be approved* by the [C]ommission."  16 Tex. Admin. Code § 26.420(e)(2) (emphasis added).  To determine the amount needed to fund TUSF, the TUSF administrator "shall compute and include the costs of" nine specified services and programs, the Commission's administrative costs associated with TUSF, any costs incurred by the Texas Commission for the Deaf and Hard of Hearing caused by its administration of two telecommunications programs, and a reserve for contingencies such as late payments and uncollectible payments in an amount authorized by the Commission.  *Id.* § 26.420(e)(1); *see also* Tex. Util. Code § 56.023(a)(1), (5) (requiring Commission to establish procedures for funding TUSF and making disbursements).  The Commission determines the services and the rates to be assessed.  Tex. Util. Code § 56.022(c); 16 Tex. Admin. Code § 26.420(f)(3)(A) (establishing basis for assessments).

To summarize the process established by PURA and the Commission's rules, the Commission determines the amount needed to fund TUSF based on the cost of each program within TUSF, sets the uniform charge in the appropriate amount to cover the costs of those programs, requires every telecommunications provider with customers in Texas to pay its share of the uniform charge (which the providers collect from their customers), and then pays monthly to each TUSF-eligible provider the amount of financial support that the provider has demonstrated it needs in a contested-case proceeding and that the Commission has ordered.

**Factual Background**

The Rural Providers are all small and rural telephone companies and not-for-profit cooperatives that use their disbursements from TUSF to build, maintain, and operate the state's wireline telephone network across more than half of Texas's land area. Up until the events that led to this lawsuit, once the Commission had established its rules and procedures for administering TUSF, the Commission fully funded TUSF. It did this by periodically analyzing and setting the assessment rate at a rate that Commission staff calculated would result in payment of the amount needed to cover the cost of the nine specified services and programs. 16 Tex. Admin. Code § 26.420(e)(1); *see also* Tex. Util. Code § 56.023(a)(1), (5). The Commission adjusted the assessment rate by order at least seven times between 2004 and 2015. The assessment rate has varied over the years, ranging from its current low of 3.3% to as high as 5.65%.

In March 2015, the Commission lowered the assessment rate (and thus the surcharge) from 3.7% to 3.3%, which remains the current rate. When the Commission lowered the rate in March 2015, the Fund's balance was $190 million. By the second quarter of 2020, however, the Fund's balance was $96 million. Of the $94 million reduction in the Fund, 80% of the reduction (totaling $75 million) had occurred in the prior year. As former Commissioner Walker explained in a May 2020 memo to former Commissioners D'Andrea and Botkin, the decrease in TUSF's balance had occurred because the taxable receipts related to the providers' provision of telecommunications services dropped by $1 billion between 2018 and 2019. Walker stated that the decrease in taxable receipts occurred because of a declining number of access lines and because some wireless providers modified the calculation of the assessment to remove costs related to data, which comprise a larger portion of wireless bills than the provision of telecommunication services. Walker informed the Commissioners that Solix was forecasting that

8

potentially as soon as December 2020, TUSF would lack sufficient revenue to fund TUSF programs. She further informed them that, based on current revenue and expenditure provisions, Commission staff were recommending an increase of the assessment rate from 3.3% to 6.4% (or potentially even 6.9%) in June 2020 to keep the Fund solvent through August 2021.

Walker's memo also informed the other Commissioners about other possible policy options that Commission staff had researched to address the impending shortfall, including changing the current revenue-based assessment to a connection-based assessment and expanding the assessment to include Voice over Internet Protocol service. However, she explained that both of those options would require an assessment rate of up to $0.80 and necessitate changes to existing rules and that those rulemaking proceedings would need to start in June 2020. She also told the other Commissioners about longer-term policy options that Commission staff had discussed, including redefining "rural area" for the purposes of TUSF support and conducting rate proceedings to adjust basic service rates that the eligible providers charge customers in high-cost areas. She proposed that the Commission seek comments on several questions related to these various options, as well as input on the legal and policy implications and the specific Commission rules that would need to be amended to implement changes. She suggested that the Commissioners discuss this "important topic" at the upcoming open meeting.

Commission staff subsequently issued a memorandum and a draft order increasing the TUSF assessment rate from 3.3% to 6.4% for the Commissioners' consideration at the upcoming June 12, 2020 open meeting. The staff memo further explained that the reduction of intrastate revenues associated with voice telephone service had occurred because voice service had become a much smaller portion of customer packages over time, and the larger companies had only recently completed the analysis of how much of their package is attributed to voice service

9

and adjusted the basis on which they charged their TUSF fee accordingly. The revenue effects of customer usage had become visible in March 2019 when TUSF began losing between $5 million and $7 million per month. Staff also noted that in the current fiscal year the Commission was completing rate-of-return adjustments for some small and rural providers to increase their support payments, which would add an additional $18 million in expenditures per year. Consequently, based on their ongoing review and evaluation of the current TUSF funding position, Commission staff concluded that an increase in the assessment rate was needed to allow for funding of expenditures through August 2021. The draft order stated that "[t]he Commission determined that the current funding requirement for the TUSF, pursuant to P.U.C. SUBST. R. 26.420(e), requires an increase to the assessment rate," and the order proposed an increased assessment rate of 6.4%.

The Commissioners discussed the proposed adjustment to the assessment rate and customer surcharge at an open meeting held on June 12, 2020. Chairman Walker opened the discussion by stating that she "believe[d] that this is something that the Legislature needs to address. . . . I think that there's some underlying, fundamental issues and policy questions on this. And I, in good conscience, can't more than double the rate at this point." The Commissioners each offered their own comments on the proposed rate increase, but all agreed that the Legislature, rather than the Commission, should address the shortfall in TUSF. Commissioner D'Andrea noted that he had "held out some hope that we could do this in an orderly and fair way through rulemaking. And after talking to outside parties and to Staff, I've come to the conclusion that it really can't be done in any reasonable amount of time." All the Commissioners agreed that because they would have to "triage" the dwindling TUSF funds if they did not increase the rate, the Commission should prioritize certain projects (identified as "lifeline projects" or "social welfare programs") over others, and they asked Commission staff to confer with Solix to work out

the details of the triage system.  The Commissioners did not take an official vote on the proposed order that would have increased the assessment rate; instead, they decided to take no action that day.

In response, on July 8, the Rural Providers filed a motion for reconsideration, requesting that the Commissioners reconsider their decision not to take action to prevent TUSF's insolvency, urging that the increased assessment rate would allow the Commission to meet its existing statutory obligations in the short term and that the Commission could then implement longer-term reforms to provide relief to customers currently paying into TUSF based on intrastate revenues.  They also filed a petition for rulemaking, proposing two other legal options that the Commission could take to address the shortfall in funding: (1) clarify that those providing Voice over Internet Protocol services must pay into TUSF and (2) switch from a revenue-based to a connections-based assessment.  The Commission took no action on the motion for reconsideration, and it denied the petition for rulemaking on August 27, 2020, reiterating in its order that "the TUSF assessment is an issue that needs to be addressed by the Legislature" and stating that "[i]t would not be a useful exercise or efficient use of agency resources to open a rulemaking in this area until after the Commission receives guidance from the Legislature."

On December 17, 2020, and December 22, 2020, respectively, the Commission (through its executive director) and Solix executed Amendment No. 1 to their contract ("Contract Amendment").  The Contract Amendment establishes the triage system that the Commissioners requested for the dwindling TUSF and directs Solix to prioritize expenditures from TUSF each month in the following order:

- pay as "first priority" disbursements all monies owed to the Fund programs for lifeline programs, including programs for low-income and disability assistance and schools and library assistance, and all monies for certain administrative expenses;

- maintain a $4 million balance in TUSF; and

- allocate any remaining money among the monthly support payments due to each eligible telecommunications provider who participates in the rural and high-cost funds.[9]

In a January 7, 2021 letter, Solix notified companies participating in rural and high-cost funds of the Contract Amendment and the implementation of the payment hierarchy among TUSF programs. Solix's letter advised that the Contract Amendment would cause a monthly delay of five days in payment and a 60%-70% reduction to the Rural Providers' support payments. In subsequent months, some TUSF disbursements were reduced by more than 70%. The Texas Telephone Association's executive director and the CEO of the Texas Statewide Telephone Cooperative Inc. attested that the Rural Providers calculate that the new payment hierarchy has resulted in a collective shortfall of approximately $10 million per month below the support amounts established by Commission orders.

In February 2021, a bipartisan group of 77 Texas legislators wrote a letter to the Commission urging it to "take emergency measures to protect rural telephone providers that rely on [T]USF funding from the financial uncertainty which has been imposed on their operations by abruptly limiting this vital revenue stream and to ensure that Texans who depend on their services

---

[9] The Contract Amendment provides that Solix must make whatever percentage of the support payments TUSF will support up to 100% of the amounts due, while maintaining a minimum $4 million fund balance. If the payments will be less than 100% of the amount for which the providers are eligible, Solix must pay each provider the same percentage of the amount owed. For example, if TUSF will support making 75% of the total monthly support payments for the three rural and high-cost plans, each eligible provider who participates in one of these programs will receive 75% of the support due to them.

do not experience a loss of connectivity." They asked the Commission to consider increasing the assessment rate and broadening the base of service providers that pay into the Fund to include Voice over Internet Protocol providers. They expressed concern that immediate urgent action was required "to prevent an unavoidable loss of connectivity in our rural communities amid the pandemic and economic crisis" and to "ensure there are adequate resources available in the fund through the 2022-2023 PUC Sunset Review Process, a natural opportunity for legislators to closely scrutinize the [T]USF and work together with stakeholders to transition the fund/funding mechanism into the future and integrate them with state broadband expansion efforts."

Following statewide power outages during the February 2021 winter storm, Chairman Walker and Commissioner Botkin resigned, and Commissioner D'Andrea became Chairman. In March 2021, then-Chairman D'Andrea testified before the House Committee on State Affairs. He acknowledged during his testimony that the Commission has "an explicit requirement to fully fund [TUSF]." Despite that acknowledgment and his further acknowledgment that the Commission had never before failed to increase the assessment when required to avoid insolvency of TUSF, the Commission failed to take emergency measures to stabilize it. The legislative session ended on May 31, 2021, without a TUSF bill becoming law.

**Procedural Background**

The Rural Providers sued the PUC Parties on January 20, 2021. They brought claims under the Uniform Declaratory Judgments Act (UDJA), Tex. Civ. Prac. & Rem. Code §§ 37.001-37.011; the Texas Administrative Procedure Act (APA), Tex. Gov't Code §§ 2001.001-.903, and the Texas Open Meetings Act (TOMA), Tex. Gov't Code §§ 551.001-.146, seeking declaratory, injunctive, and mandamus relief and attorneys' fees. They also asserted a regulatory-

13

takings claim seeking monetary damages, if injunctive relief was not promptly granted to preserve the status quo. They alleged that (1) the Commissioners' actions were ultra vires because they violated the policies and practices established by PURA, the Commission's rules, and the Commission's orders when they allowed TUSF to become insolvent and instituted a payment hierarchy by prioritizing funding for some TUSF programs over others; (2) the PUC Parties violated the APA's procedures by adopting a new policy of withholding TUSF funding and creating a payment hierarchy among TUSF programs without following the APA's rulemaking process; (3) the December 2020 Contract Amendment was executed in violation of the TOMA; and (4) the Contract Amendment constituted a regulatory taking.

Both parties presented summary-judgment motions on undisputed facts. The Rural Providers filed a traditional summary-judgment motion seeking judgment as a matter of law on all their claims. The PUC Parties then filed a combined plea to the jurisdiction and cross-motion for summary judgment. They asserted that the Rural Providers had failed to plead a valid waiver of sovereign immunity, arguing that the Rural Providers (1) had failed to invoke the narrow waiver of immunity provided by the Legislature for proceedings before the Commission because they failed to satisfy the requirement that they must exhaust their administrative remedies, (2) had not pleaded claims for which either the UDJA or the APA's declaratory-judgment provision waived immunity, (3) had failed to plead a valid ultra vires claim because the Commissioners' role in raising the assessment rate is discretionary and not a purely ministerial act, (4) had failed to plead a valid TOMA claim, and (5) failed to plead a valid regulatory takings claim.

Alternatively, the PUC Parties also moved for summary judgment, asserting that even if the trial court concluded it had jurisdiction to hear the case, the Rural Providers had failed to meet their burden of proof on damages or to establish that the Commission was required to

14

approve the rate increase recommended by Commission staff, which would "remove[] the exclusive jurisdiction from the Commission and subvert[] the explicit grant of authority the Legislature has made." The PUC Parties also argued the Commission is required to ensure rates are reasonable, contending that contrary to the Rural Providers' argument, the Commission has discretion to determine when the fee assessment becomes so high as to be unreasonable, and it has a statutory obligation under Utility Code Section 56.023(a) to ensure that the TUSF assessment is done "in a manner that assures reasonable rates." Finally, the PUC Parties asserted that the remedies sought by the Rural Providers are unconstitutional because they would violate the doctrine of separation of powers by requiring the court to prescribe the terms of the Commission's order.

In its order, without providing its reasons, the trial court stated, "The Court believes the Plea to the Jurisdiction and the Cross-Motion for Summary Judgment are meritorious and should be granted. This case is therefore dismissed." The Rural Providers appeal from this order.

## STANDARD OF REVIEW

**Cross-Motions for Summary Judgment**

We review the trial court's ruling on summary-judgment motions de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). To prevail on a traditional summary-judgment motion, the movant must show that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c). "On cross-motions for summary judgment, each party bears the burden of establishing that it is entitled to judgment as a matter of law." *City of Garland v. Dallas Morning News*, 22 S.W.3d 351, 356 (Tex. 2000). When the trial court grants one motion and denies the other, "we consider the summary-judgment evidence

15

presented by both sides, determine all questions presented, and if the trial court erred, render the judgment the trial court should have rendered." *Southwestern Bell Tel., L.P. v. Emmett*, 459 S.W.3d 578, 583 (Tex. 2015). Here, where the parties dispute not the facts but the legality of the PUC Parties' actions, "we review the cross-motions for summary judgment by determining all legal questions presented." *Guynes v. Galveston County*, 861 S.W.2d 861, 862 (Tex. 1993); *see also Tarr v. Timberwood Park Owners Ass'n, Inc.*, 556 S.W.3d 274, 278-79 (Tex. 2018).

**Plea to the Jurisdiction**

A plea to the jurisdiction is a dilatory plea seeking dismissal of a case for lack of subject-matter jurisdiction. *Harris County v. Sykes*, 136 S.W.3d 635, 638 (Tex. 2004). We review the trial court's ruling on a plea to the jurisdiction de novo. *Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 228 (Tex. 2004).

The burden is on the plaintiff to affirmatively demonstrate the trial court's jurisdiction. *Heckman v. Williamson County*, 369 S.W.3d 137, 150 (Tex. 2012). When, as here, a plea to the jurisdiction challenges the pleadings, we determine if the plaintiffs have "alleged facts that affirmatively demonstrate the court's jurisdiction to hear the cause." *Miranda*, 133 S.W.3d at 226; *see also Houston Belt & Terminal Ry. Co. v. City of Houston*, 487 S.W.3d 154, 160 (Tex. 2016). When making this determination, we construe the pleadings liberally in the plaintiffs' favor, taking them as true, and looking to the plaintiffs' intent. *Miranda*, 133 S.W.3d at 226. The plea to the jurisdiction may be granted without affording the plaintiffs an opportunity to replead only if the pleadings affirmatively negate jurisdiction. *Id.*

We may also consider evidence that the parties have submitted that is relevant to the jurisdictional issues, and we must do so when necessary to resolve those jurisdictional issues.

16

*Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000). In this case, the relevant evidence submitted by the parties relates to the undisputed actions taken by the PUC Parties and to various Commission proceedings. Among other documents, the evidence includes the June 2020 open meeting transcript, the December 2020 Contract Amendment, affidavits from the executive director of the Texas Telephone Association and the CEO of the Texas Statewide Telephone Cooperative Inc., and the orders establishing the monthly TUSF support amounts for various Rural Providers. The PUC Parties challenged only the sufficiency of the Rural Providers' pleadings; they did not attempt to negate the existence of any pleaded jurisdictional facts alleged or present evidence to controvert the evidence submitted by the Rural Providers. Consequently, we must take as true the Rural Providers' factual allegations and evidence. *See Texas Dep't of Transp. v. Sunset Transp., Inc.*, 357 S.W.3d 691, 697-98 (Tex. App.—Austin 2011, no pet.) (citing *Miranda*, 133 S.W.3d at 226; *Creedmoor-Maha Water Supply Corp. v. Texas Comm'n on Env'tl Quality*, 307 S.W.3d 505, 513, 516 n.8. (Tex. App.—Austin 2010, no pet.)).

Our ultimate inquiry in this case is whether the pleaded and unnegated facts presented by the Rural Providers, taken as true and liberally construed with the pleaders' intent in mind, affirmatively demonstrate claims within the trial court's subject-matter jurisdiction. *See Bacon v. Texas Historical Comm'n*, 411 S.W.3d 161, 171 (Tex. App.—Austin 2013, no pet.); *see also Miranda*, 133 S.W.3d at 228 ("[I]f the relevant evidence is undisputed or fails to raise a fact question on the jurisdictional issue, the trial court rules on the plea to the jurisdiction as a matter of law."). To resolve this ultimate question, we must construe the statutory or constitutional provisions that are implicated, apply them to the facts pleaded by the Rural Providers, and determine whether the Rural Providers have alleged acts that exceed the PUC Parties' authority under the relevant statutory provisions and Commission rules or that constitute violations of the

17

APA, the relevant constitutional provisions, or the TOMA. *See Creedmoor-Maha*, 307 S.W.3d at 516.

**Construction of Statutes and Administrative Rules**

We construe both statutes and administrative rules under traditional principles of statutory construction. *See TGS–NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 438 (Tex. 2011) (citing *Rodriguez v. Service Lloyds Ins.*, 997 S.W.2d 248, 254 (Tex. 1999)). When we construe statutes or administrative rules, our primary objective is to ascertain and give effect to the drafters' intent. *See id.* at 439 (Tex. 2011). To discern that intent, we begin with the plain and ordinary meaning of the statute's or rule's words, using any definitions provided by the enacting body. *See Houston Belt*, 487 S.W.3d at 164. We further construe statutes and rules as a whole, rather than as isolated provisions. *See TGS–NOPEC*, 340 S.W.3d at 439. We presume the Legislature intended a fair and reasonable result. *See* Tex. Gov't Code § 311.021(3). We presume the enacting body purposefully included each word, and that words not included were purposefully omitted. *In re M.N.*, 262 S.W.3d 799, 802 (Tex. 2008). We construe the statute or rule to avoid rendering any word or provision meaningless. *Houston Belt*, 487 S.W.3d at 164. When clear, the text is determinative of the enacting body's intent unless the plain meaning produces an absurd result. *Id.* at 164-65.

While we normally defer to the agency's interpretation of a statute or regulation "if there is vagueness, ambiguity, or room for policy determinations," we do so only to the extent the agency's interpretation is reasonable and if it is not plainly erroneous or inconsistent with the statute's or rule's language. *TGS-NOPEC*, 340 S.W.3d at 438. "[N]o deference is due where an

agency's interpretation fails to follow the clear, unambiguous language of its own regulations." *Id.* An agency is bound by its own regulations. *See Rodriguez*, 997 S.W.2d at 255.

## ANALYSIS

The Rural Providers challenge the trial court's dismissal of all their claims. The PUC Parties argue that (1) the Rural Providers have failed to plead valid ultra vires claims because the complained-of acts were permissible exercises of the Commission's discretion to administer TUSF, (2) their UDJA claim is barred by sovereign immunity because they do not challenge the validity of a statute and the requested declaratory relief is redundant of the relief requested for their other claims, (3) their APA claims are barred by sovereign immunity because the complained-of acts are not rules and they failed to exhaust their administrative remedies, (4) they have failed to plead a valid takings claim because inaction does not constitute a taking, and (5) their TOMA claim fails because they have not pleaded or proven that the Commission took action related to the December 2020 Contract Amendment behind closed doors and because the Commission's executive director had the power to execute that Contract Amendment. In sum, the PUC Parties contend that because the Rural Providers' suit impermissibly seeks to control the Commission's exercise of its broad discretion over TUSF, each of the improperly pleaded claims is barred by sovereign immunity.

Absent the State's consent to suit, sovereign immunity deprives Texas trial courts of subject-matter jurisdiction for lawsuits in which the State or certain governmental units, including State agencies or boards, have been sued. *Miranda*, 133 S.W.3d at 224; *see also Texas Nat. Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 853-54 (Tex. 2002) ("The Legislature may consent to suits against the State by statute or by resolution."). The Legislature has mandated

19

that "a statute shall not be construed as a waiver of sovereign immunity unless the waiver is effected by clear and unambiguous language." Tex. Gov't Code § 311.034.

The modern justifications for the common-law doctrine of sovereign immunity are two-fold: (1) it protects the public treasury from the costs of litigation and (2) it preserves separation-of-powers principles because the doctrine prevents the judiciary from interfering with the legislative prerogative to allocate tax dollars. *Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 121 (Tex. 2015). While sovereign immunity generally shields "the public from the costs and consequences of improvident actions of their governments," *Tooke v. City of Mexia*, 197 S.W.3d 325, 332 (Tex. 2006), it also "places the burden of shouldering those 'costs and consequences' on injured individuals." *Brown & Gay Eng'g*, 461 S.W.3d at 121. This same immunity generally extends to a state official who is sued in his official capacity, like the PUC Commissioners in this case. *See City of El Paso v. Heinrich*, 284 S.W.3d 366, 373 (Tex. 2009) (noting that suit against state official is merely another way to plead suit against entity for which official is agent). Thus, "sovereign immunity compels Texas courts to defer to the Legislature as the gatekeeper controlling when and how citizens can sue their state government or its officers for their official acts." *Bacon v. Texas Historical Comm'n*, 411 S.W.3d 161, 173 (Tex. App.—Austin 2013, no pet.). Moreover,

> [t]his principle of judicial deference embodied in sovereign immunity extends not only to the Legislature's choices as to whether state funds should be spent on litigation and court judgments versus other priorities, but equally to the policy judgments embodied in the constitutional or statutory delegations that define the parameters of an officer's discretionary authority and the decisions the officer makes within the scope of that authority.

*Id.*

20

With these principles in mind, we turn to the Rural Providers' first issue, in which they contend that they have properly pleaded and proven that the Commissioners' June 2020 decision and the December 2020 Contract Amendment are ultra vires acts, and thus they are entitled to the declaratory, injunctive, and mandamus relief that they seek.[10]

## I.    Ultra Vires Claims

We first consider whether the Rural Providers properly pleaded ultra vires claims against the PUC Parties, resulting in those claims not being barred by sovereign immunity, and then whether the Rural Providers established as a matter of law their entitlement to the requested relief of a declaratory judgment, permanent injunction, and a writ of mandamus. The PUC Parties challenged the trial court's jurisdiction over the Rural Providers' ultra vires claims and their accompanying request for relief under the UDJA. The PUC Parties assert that the Rural Providers failed to plead a viable ultra vires claim because the Legislature has given the Commission broad authority to "act as necessary and convenient to administer" TUSF, *see* Tex. Util. Code § 56.023(d), and to regulate telecommunications utilities so that their rates are "just, fair, and reasonable and the services are adequate and efficient," *id.* § 52.002(a), meaning that the Commissioners had the discretion to refuse to increase the assessment rate, even if that means inadequately funding TUSF. In addition, the PUC Parties argue that paying the full amounts of Commission-ordered TUSF support to eligible providers is not a ministerial act because that would

---

[10] The Association Appellants and the Windstream and CenturyLink Appellants organize and number their issues presented differently. Each group of appellants challenges the trial court's rulings dismissing their ultra vires claims, their APA-rulemaking claims, their takings claims, and their TOMA claim and argues that we should reverse the trial court's ruling on the cross-motions for summary judgment and render judgment in their favor. Accordingly, we have grouped the issues presented by claim and only note significant differences in the two groups' arguments where necessary.

require the Commissioners to render TUSF insolvent, which no statute or regulation requires them to do.

Under the ultra vires exception, sovereign immunity does not bar suits against state officials acting in their official capacity that seek prospective injunctive or declaratory relief to compel the state officials' compliance with statutory or constitutional provisions. *Heinrich*, 284 S.W.3d at 372-75 ("[S]uits to require state officials to comply with statutory or constitutional provisions are not prohibited by sovereign immunity, even if a declaration to that effect compels the payment of money."). Sovereign immunity does not bar such claims because "extending immunity to officials using state resources in violation of the law would not be an efficient way of ensuring those resources are spent as intended." *Id.* at 372; *see also Houston Belt*, 487 S.W.3d at 157 (explaining that "the pragmatic rationale" of protecting public from litigation costs, which supports sovereign-immunity doctrine, "also helps to delineate its limits"). "*[U]ltra vires* suits do not attempt to exert control over the state—they attempt to reassert the control of the state. Stated another way, these suits do not seek to alter government policy but rather to enforce existing policy." *Heinrich*, 284 S.W.3d at 372.

To fall within the ultra vires exception, a suit "must allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act." *Id.*; *see also Van Boven v. Freshour*, No. 20-0117, __ S.W.3d ___, 2022 WL 2015663, at *4 (Tex. June 3, 2022) (explaining that agency's sovereign immunity from suit "extends to its officials who act consistently with the law but not to those who act ultra vires" (footnote omitted)). "Ministerial acts are those 'where the law prescribes and defines the duties to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment.'" *Emmett*, 459 S.W.3d at 587 (quoting *City of Lancaster v. Chambers*, 883 S.W.2d 650, 654 (Tex. 1994)). Immunity does

22

not protect all acts requiring some exercise of discretion; a government officer may not exceed the bounds of his granted authority or act in conflict with the law. *Houston Belt*, 487 S.W.3d at 158. The Rural Providers argue that the Commissioners acted without legal authority when they refused to increase the assessment rate and instead created a payment hierarchy that effectively revised the Rural Providers' Commission-ordered TUSF support amounts without notice or a hearing. They also argue that the Commissioners failed to perform their ministerial duties to pay the precise monthly per-line support amounts established in the Commission's final orders that the Rural Providers are entitled to receive.

### A.      Legal Authority

The Rural Providers contend that the Commissioners acted without legal authority in two ways when they directed staff to amend the Solix contract, resulting in the failure to pay the Rural Providers the full Commission-ordered amount of their monthly support payments. First, the Rural Providers argue that by not fully funding TUSF and instead creating a payment hierarchy that prioritizes payments made through some TUSF programs to the detriment of other programs, the Commissioners violated several statutes that specify how the Commission must administer TUSF. Second, the Rural Providers argue that the Contract Amendment violates the Commission's final orders that direct Solix to pay each provider very specific amounts of support each month because the Amendment effectively reduced those monthly support amounts. We will consider these arguments together to determine whether these acts by the Commissioners exceed the scope of the legal authority and discretion that PURA grants them to fund and administer TUSF, as well as whether the Commissioners lack legal authority to violate the Commission's own final orders.

23

The overarching question is whether the Commissioners acted without legal authority when they refused to increase the assessment rate at the June 2020 open meeting and instead directed Commission staff to triage the dwindling TUSF by prioritizing certain projects over others and to figure out the details with Solix, which resulted in the December 2020 Contract Amendment's creation of a payment hierarchy. The Rural Providers assert that the Commissioners lacked legal authority to take these actions and that these actions are contrary to express statutory provisions. In response, the PUC Parties argue that PURA gives the Commission broad authority to "act as necessary and convenient to administer the [F]und," Tex. Util. Code § 56.023(d), and "to regulate rates . . . so that the rates are just, fair, and reasonable," *id.* § 52.002(a), and that this broad authority gives the Commission and its Commissioners sufficient discretion to defeat the Rural Providers' ultra vires claims.

As the Texas Supreme Court explained in *Houston Belt*,

> [a]lthough governmental immunity justifiably provides broad protection to the government and its agents, it does not protect *every* act by a government officer that requires some exercise of judgment—a government officer with some discretion to interpret and apply a law may nonetheless act "without legal authority," and thus *ultra vires*, if he exceeds the bounds of his granted authority or if his acts conflict with the law itself.

*Houston Belt*, 487 S.W.3d at 158. "An *ultra vires* claim based on actions taken 'without legal authority' has two fundamental components: (1) authority giving the official some (but not absolute) discretion to act and (2) conduct outside of that authority." *Hall v. McRaven*, 508 S.W.3d 232, 239 (Tex. 2017) (citing *Houston Belt*, 487 S.W.3d at 158). While sovereign immunity bars suits complaining of an exercise of absolute discretion, it does not bar suits complaining of "an officer's exercise of judgment or *limited* discretion without reference to or in conflict with the

24

constraints of the law authorizing the official to act." *Houston Belt*, 487 S.W.3d at 163 (noting that "as a general rule, 'a public officer has no discretion or authority to misinterpret the law.'" (quoting *In re Smith*, 333 S.W.3d 582, 585 (Tex. 2011) (orig. proceeding))).

Here, the Rural Providers argue that the Commissioners' discretion was subject to explicit legal constraints that they violated when they effectively reduced the Rural Providers' monthly TUSF support amounts and when they determined the rates consumers pay to fund TUSF and the services to which those rates apply. The PUC Parties, on the other hand, argue that the statutory provisions allowing the Commission to "act as necessary and convenient to administer the fund and this chapter," Tex. Util. Code § 56.023(d), and to regulate rates give the Commissioners essentially unconstrained discretion to refuse to raise the assessment rate and to establish a prioritization scheme as the amount of money in TUSF has dwindled. We look to the language of the governing statute and the Commission's rules to determine whether the Rural Providers have properly alleged facts and established as a matter of law that the Commissioners acted ultra vires.

The Rural Providers identify the following statutes as the key provisions requiring the Commissioners to adequately fund TUSF:

- First, the Legislature has commanded the Commission and its Commissioners to "fund" TUSF and pay providers in Section 56.023 by directing them to take actions the Commission "finds necessary to fund the universal service fund and make distributions from that fund." *Id.* § 56.023.

- Second, the Legislature has directed the Commission (and thus its Commissioners) that TUSF must be sufficient in size to "make distributions from the fund" that ensure rural telecommunications services are "available at prices that are reasonably comparable to prices charged for similar services in urban areas." *Id.* § 51.001(g). In other words, the Fund may not be underfunded to the point that the telecom providers will need to raise rates to a level that exceeds urban rates to cover their costs.

25

- Third, the Legislature has mandated that "[t]he [C]ommission shall make each disbursement from the universal service fund promptly and efficiently so that a telecommunications provider does not experience an unnecessary cash-flow change as a result of a change in governmental policy." *Id.* § 56.026. This provision precludes late payment of the Commission-ordered amounts that the Rural Providers are entitled to.

The Rural Providers assert that these provisions, taken together, prohibit the Commissioners from underfunding TUSF and underpaying the Rural Providers' Commission-ordered support amounts. We agree. When the statute is read as a whole, the Legislature's intent, as further embodied in the Commission's rules, is clear: while the Commission has discretion to decide *how* to fund TUSF, it lacks the discretion to underfund TUSF and to fail to make payments owed to the Rural Providers under its own orders.

In addition to the statutory provisions set forth above, the statutory provisions and the Commission's rules that set forth the mechanism for establishing the uniform charge and assessment rate and for determining the telecom providers' monthly support amounts further support our conclusion that the Commissioners acted in conflict with their legal constraints when they decided to allow TUSF to be funded in an amount insufficient to comply with the Commission's own orders, effectively reducing the Rural Providers' ordered support amounts. Significantly, the Commission's own rules require that the Fund administrator "shall determine, on a periodic basis, the amount needed to fund the TUSF" and that "[t]he determined amount *shall be approved* by the [C]ommission." 16 Tex. Admin. Code § 26.420(e)(2) (emphasis added). The Commission's rule also mandates that the Fund administrator must determine the amount needed to fund TUSF by "comput[ing] and includ[ing] the costs of" nine specified services and programs—including the high-cost and rural programs at issue here—as well as certain specified

administrative costs and a contingency reserve. *Id.* § 26.420(e)(1). Under PURA and the Commission's rules, the costs of the high-cost and rural programs—that is, the amount of support that each eligible telecommunications provider receives from TUSF—is determined through a contested case or other administrative proceeding, based on each individual provider's demonstrated financial need for continued support from TUSF. Those contested-case proceedings result in Commission orders establishing the precise monthly support amounts to be disbursed by Solix to the providers. *See, e.g.*, Tex. Util. Code §§ 56.023(a)(1), (4), (5), (g), (i), .026 (requiring disbursements from Fund to be made promptly and efficiently); 16 Tex. Admin. Code §§ 26.403(e), .404(e), (f), .405(e), (f), .407(h), .408(d), .420, .423(e)(2).

If the Commissioners were complying with the statutory scheme, they would have determined the amount needed to fund TUSF based on the cost of each program within TUSF, and they would have then set the statewide uniform charge to be paid by providers and the assessment rate used to calculate the charge in an amount appropriate to fund the costs of those programs. PURA does grant the Commission limited discretion to determine on which services and at what rates the uniform charge will be assessed in order to fund TUSF. *See* Tex. Util. Code § 56.022(c). The Commission established by its rules that the uniform charge assessed on each provider is calculated by multiplying the Commission-approved assessment rate by the provider's "monthly taxable actual intrastate telecommunications services receipts."[11] 16 Tex. Admin. Code

---

[11] As explained above, the assessment rate is the same as the customer surcharge rate because the Commission's rules allow providers to pass this cost on to their customers. 16 Tex. Admin. Code § 26.420(f)(6)(A)(ii) (allowing providers to recover amount of their assessment through surcharge). Until June 2020, Commission staff recommended to the Commissioners what percentage of a provider's monthly taxable actual intrastate telecommunications receipts that assessment rate should be, based on the determination of the amount needed to fund TUSF, and the Commissioners approved the recommended rate. *See id.* § 26.420(e)(2)).

§ 26.420(f)(3)(A); *see also id.* § 26.420(f)(4). The Commission's rules also allow the telecommunications providers to recover the amount of their assessment through a surcharge "assessed as a percentage of intrastate telecommunications services receipts on every retail customers' bill, except Lifeline and/or Link Up services." *Id.* § 26.420(f)(6)(A)(ii). Thus, to the extent the Commissioners expressed concern at the June 2020 open meeting about Commission staff's recommendation to increase the assessment rate from 3.3% to 6.4% to fund TUSF at the level required by the cost of TUSF programs, the Commissioners had the discretion (which they acknowledged during the June 2020 open meeting) to implement other options, such as changing the revenue-based assessment to a connection-based assessment and expanding the assessment to include Voice over Internet Protocol service. Although both of these options and some of the other possible long-term options for addressing TUSF's dwindling balance would require changes to existing rules via rulemaking proceedings, as Chairman Walker had explained in her memo to the other Commissioners, these were alternatives that were within the Commissioners' discretion to consider. Refusing to approve the assessment rate at the amount required to cover the cost of TUSF programs (including the Commission-ordered monthly support amounts) was not an option within the Commissioners' discretion. The statutory scheme requires the Commissioners to fund TUSF at the level needed to cover the costs of TUSF programs. *See id.* § 26.420(e)(1)-(2). The Legislature provided them with the discretion to implement various means of funding TUSF—it did not provide them with discretion to abdicate their responsibility to fund it.

By directing Commission staff to work with Solix to create a prioritization system for distribution of TUSF instead of approving the recommended increase in the assessment rate, the Commissioners also violated another legal constraint on their discretion: PURA's directive that when the Commission establishes the uniform charge and the services to which the charge will

28

apply, the Commission "may not ... grant an unreasonable preference or advantage to a telecommunications provider ... or subject a telecommunications provider to unreasonable prejudice or disadvantage." Tex. Util. Code § 56.022(c)(1), (3). By choosing to fully fund certain TUSF programs and allowing other programs to go underfunded, those telecommunications providers who participate in the underfunded programs are subject to the very disadvantage that the Legislature established TUSF to remedy. They are providing high-cost services to customers that other telecommunications providers do not provide, despite having demonstrated to the Commission in contested-case proceedings their need for financial support from TUSF to be able to provide services to customers in high-cost areas at rates comparable to urban areas.

Moreover, PURA also precludes the Commissioners from revising the monthly support amounts to be made available from TUSF without providing notice and an opportunity for a hearing. *Id.* § 56.031, .032(b). PURA further directs the Commission that it "shall consider the adequacy of basic rates to support universal service" when determining appropriate monthly support amounts. *Id.* § 56.031, .032(b). The Commissioners' direction to Commission staff to establish a prioritization scheme for TUSF disbursements and the subsequent Solix Contract Amendment violated these legal constraints by effectively revising the Rural Providers' monthly support amounts established in the Commission's orders without providing notice and an opportunity for a hearing or consideration of the adequacy of basic rates to support universal service. As will be discussed in more detail when we address the Commission's ministerial duties, there is no dispute that the Commission's orders establishing the exact amounts of TUSF support that the Rural Providers are entitled to receive each month are final, valid, and still in effect. The Commission "lacks statutory authority or any implied power to review in any judicial capacity its orders which have become final." *Public Util. Comm'n of Tex. v. Brazos Elec. Power Co-op., Inc.*,

29

723 S.W.2d 171, 173 (Tex. App.—Austin 1986, writ ref'd n.r.e.). Thus, the Commissioners' direction to staff to implement a prioritization system, which resulted in the Contract Amendment and subsequent reduced payments to the Rural Providers, exceeded their legal authority and the statutory constraints of PURA.

The PUC Parties assert that because PURA has granted the Commission authority to "act as necessary and convenient to administer" TUSF, Tex. Util. Code § 56.023(d), and to "regulate rates . . . so that the rates are just, fair, and reasonable," *id.* § 52.002(a), the Commissioners had the discretion to refuse to increase the assessment rate during the COVID-19 pandemic, which made the prioritization scheme "necessary and convenient" until the Legislature acts to remedy TUSF's dwindling balance. The PUC Parties also argue that they did not "effectively review" or "rewrite" the Commission's orders establishing monthly support amounts because those orders do not give them the authority to overdraft TUSF and also because they assert they have discretion to set the assessment rate at whatever level they want. They contend that to construe the statutory scheme as the Rural Providers suggest would have an absurd result:

> Taken to its logical conclusion, [the Rural Providers'] argument would require the [Commission] to continuously and exponentially raise the assessment rate to allow the [Commission] to pay the full amounts set out in its orders while wholly ignoring both the fundamental problems facing the TUSF and the effect on the numerous Texans whose bills would balloon to keep the TUSF solvent.[12]

We disagree. The absurd result would come from construing the statutory scheme as the PUC Parties suggest. While they seem to acknowledge that their authority stops short of allowing TUSF

---

[12] We note that the PUC Parties did not present evidence that the proposed increase in the assessment rate would have caused bills to "balloon." On a typical residential landline bill of $40, a 3.3% charge would be $1.32, while a 6.4% charge would be $2.56—an increase of $1.24 per month or $14.88 per year.

to become insolvent, their proposed construction of PURA has no limit that would preclude them from reducing the assessment rate to zero if they deemed it "necessary and convenient."

We construe PURA as granting the Commission and its Commissioners authority to determine how to fund TUSF because it provides them with limited discretion to determine on what services and at what rates the uniform charge used to fund TUSF will be assessed. *Id.* § 56.022(c). However, PURA, the Commission's own rules, and the Commission's final orders establishing monthly support amounts all constrain the Commission and its Commissioners' limited discretion and preclude them from underfunding TUSF. Accordingly, considering the statutory scheme as a whole and construing the pleadings in the Rural Providers' favor, we conclude that the Rural Providers' pleadings are sufficient to confer the trial court with jurisdiction over these viable ultra vires claims and that they have established as a matter of law that the Commissioners acted without legal authority. *See Houston Belt*, 487 S.W.3d at 164; *see also Guynes*, 861 S.W.2d at 862.

### B.     Ministerial Duty

The Rural Providers also contend that the Commissioners have failed, and continue to fail, to perform a purely ministerial act by failing to pay the monthly per-line support amounts established in the Commission's final orders. The Rural Providers pleaded and submitted evidence that the Commission has exercised its authority to determine whether various telecommunications providers qualify to receive funds from TUSF through either an election-and-reporting process or contested-case proceedings and that "every TUSF recipient has a Commission final order determining how much support that provider should receive." *See generally* Tex. Util. Code § 56.023 (establishing Commission's powers and duties, including duty to "adopt eligibility

31

criteria and review procedures, including a method for administrative review" that are "necessary to fund the universal service fund and make distributions from that fund"). Payment of monies owed is "purely ministerial" under certain circumstances. *State v. Epperson*, 42 S.W.2d 228, 231 (Tex. 1931) (holding that tax collector's statutory duty to make payments owed to persons who are entitled to receive money under valid contracts is purely ministerial); *see also Janek v. Harlingen Family Dentistry, P.C.*, 451 S.W.3d 97, 104 (Tex. App.—Austin 2014, no pet.) (affirming district court's judgment issuing writ of mandamus requiring State officials to comply with Texas Health & Human Services Commission's final order requiring them to release to plaintiff dental group Medicaid reimbursement funds that had been withheld under temporary payment hold and concluding order required release of funds already held, not merely reduction in amount of payment hold that could be imposed going forward).

In this case, the Commission's own rules characterize "disbursing the proper support amounts" from TUSF as one of the "ministerial functions" of TUSF administration. 16 Tex. Admin. Code § 26.420(c), (d)(2)(D). And as explained above, PURA prohibits the Commissioners from revising the monthly support amounts the Rural Providers are owed from TUSF without providing notice and an opportunity for a hearing. Tex. Util. Code § 56.031-.032(b).

The PUC Parties do not dispute that the Commission's final orders obligate them to pay the monthly support amounts. Instead, they argue that the shortfall in TUSF precludes them from fulfilling their ministerial duty to pay, and that their orders do not either give them the authority to overdraft TUSF or remove their discretion to set the TUSF assessment rate. In other words, they assert that the allegedly ultra vires decision to allow TUSF to become underfunded prevents them from fulfilling their ministerial obligations. However, as we concluded above, this

32

obligation to pay ordered amounts, which is part of the Commission's calculation of how much money is needed to fund TUSF, is itself one of the legal constraints that limits the Commissioners' discretion in setting the assessment rate.

We agree with the Rural Providers that the Commissioners did not have discretion to disregard the Commission's own final orders. As explained above, the Commissioners may not reopen a final proceeding or review the Commission's own final orders. *Brazos Elec.*, 723 S.W.2d at 173 (holding that Commission "lacks statutory authority or any implied power to review in any judicial capacity its orders which have become final"); *see also Coalition of Cities for Affordable Util. Rates v. Public Util. Comm'n of Tex.*, 798 S.W.2d 560, 564 (Tex. 1990) (holding that Commission order is final unless Legislature has granted statutory power to reopen matter that Commission previously considered). We conclude that the Rural Providers sufficiently pleaded this ultra vires claim to confer jurisdiction on the trial court, and we hold as a matter of law that the Commissioners failed to perform their ministerial duty to ensure that the Commission paid monies owed when they directed Solix to pay less than the full monthly support amounts.

## C.     Remedies

Because the trial court rendered final judgment on the parties' cross-motions for summary judgment, the Rural Providers urge that if we conclude that their ultra vires claims are not barred by sovereign immunity, then we should render judgment in their favor by rendering a declaratory judgment under the UDJA, entering a permanent injunction, and issuing a writ of mandamus. "When competing summary-judgment motions are filed, . . . if 'the trial court grants one motion and denies the other, the reviewing court should determine all questions presented' and 'render the judgment that the trial court should have rendered.'" *Tarr*, 556 S.W.3d at 278-79

33

(quoting *City of Garland v. Dallas Morning News*, 22 S.W.3d 351, 356 (Tex. 2000)); *see also Guynes*, 861 S.W.2d at 862 (reviewing cross-motions for summary judgment when both parties presented motions on undisputed facts by "determining all legal questions presented"). In this case, the parties sought matter-of-law judgments on the same issue: whether the Rural Providers properly alleged and established their ultra vires claims. The facts underlying the Rural Providers' ultra vires claims are undisputed, and as a matter of law, we have concluded that the Commissioners' conduct was ultra vires.[13] Accordingly, we will examine the summary-judgment evidence to determine whether the Rural Providers established that they are entitled to judgment as a matter of law on each of their requests for relief.

### 1. Declaratory Judgment

The Rural Providers contend that the trial court erred by denying their summary-judgment motion because they have established as a matter of law their entitlement to a declaratory judgment under the UDJA based on the Commissioners' ultra vires actions.[14] *See* Tex. Civ. Prac.

---

[13] In their combined plea and motion in the trial court, the PUC Parties asserted that the Rural Providers had not satisfied their burden of proof, arguing that they had failed to plead evidence of what amounts they had not been paid and what amounts they contend they are entitled to. However, as we noted earlier, the Rural Providers submitted evidence to the trial court of the Commission's orders establishing the monthly support amounts that the Commission determined they are entitled to receive each month and of the shortfall after December 2020. It is undisputed that under the 2020 Contract Amendment, they have been receiving approximately 30% of those monthly support amounts. This evidence is sufficient to demonstrate their entitlement to the declaratory, injunctive, and mandamus relief that they seek here. And the PUC Parties do not contend on appeal that the Rural Providers failed to satisfy their burden of proof on any element of their claims or that there are any fact issues precluding summary judgment.

[14] The PUC Parties argue that to the extent the Rural Providers attempted to bring claims for declaratory relief under the UDJA (presumably against the Commission) that are independent of their other claims, those claims are barred by sovereign immunity because the Rural Providers are not challenging the validity of a statute and instead are challenging the Commission's actions under PURA. *See Texas Dep't of State Health Servs. v. Balquinta*, 429 S.W.3d 726, 746 (Tex. App.—Austin 2014, pet. dism'd) (explaining that UDJA provides only limited waiver of

34

& Rem. Code § 37.004(a) (allowing party whose rights are affected by statute to have determined any question of construction arising under statute and to obtain declaration of rights); *see also Texas Dep't of Transp. v. Sefzik*, 355 S.W.3d 618, 621 (Tex. 2011) (noting that while UDJA does not waive sovereign immunity of state agency when plaintiffs seek declaration of their rights under statute or other law, same claims often may be brought against official under ultra vires exception (citing *Heinrich*, 284 S.W.3d at 372-73)). In their summary-judgment motion, the Rural Providers sought a judgment under the UDJA declaring that:

- The [Commissioners] must fully fund all existing obligations of all TUSF programs and make each of the disbursements [the Commission] previously authorized . . . .

- The artificial hierarchy among TUSF programs that the [Commissioners] created in the December 17, 2020 contract amendment, and its subsequent failure to fully fund all existing TUSF commitments are substantively unlawful, violating Commission precedent, including approximately 200 prior proceedings; its own rules, including 16 TAC § 26.420; and the Commission's enabling statute, PURA, particularly PURA § 56.023(a)(1), and (5) . . . .

The PUC Parties argue that this declaratory judgment would be entirely redundant of the remedies that the Rural Providers seek for their other claims. They urge that because "a declaratory judgment action will not lie to provide redundant remedies," *Strayhorn v. Ray-theon E-Sys., Inc.*, 101 S.W.3d 558, 572 (Tex. App.—Austin 2003, pet. denied), the Rural Providers cannot maintain this separate claim for a declaratory judgment under the UDJA. Consequently, the PUC Parties

---

immunity); *see also Texas Dep't of Transp. v. Sefzik*, 355 S.W.3d 618, 621-22 (Tex. 2011) (per curiam) (explaining that supreme court necessarily concluded in *Heinrich* that "the UDJA does not waive the state's sovereign immunity when the plaintiff seeks a declaration of his or her rights under a statute or other law" (citing *City of El Paso v. Heinrich*, 284 S.W.3d 366, 372-73 (Tex. 2009))). In reply, the Rural Providers confirm that they bring no such claims and reassert that the UDJA is a proper vehicle to assert their ultra vires claims seeking equitable and injunctive relief against the Commissioners. *See Heinrich*, 284 S.W.3d at 370, 373.

assert, the Rural Providers' declaratory-judgment claim amounts to a mere vehicle for obtaining attorneys' fees. *See id.*

The Rural Providers contend that the declaratory judgment that they seek under the UDJA for their ultra vires claims is not redundant of the other declaratory and injunctive relief that they seek for their APA and TOMA claims because their requested UDJA declaration that the Commissioners are violating PURA is distinct from declarations that the Commission violated the APA or that the Commissioners violated TOMA. They argue that declarations regarding their APA and TOMA claims against the Commission would not preclude the Commissioners (and through them, the Commission) in the future from again refusing to fully fund TUSF as long as they first complied with the substantive requirements of the APA and TOMA. The Rural Providers acknowledge that the declaratory-judgment remedy may not be used to obtain otherwise impermissible attorneys' fees "for declarations that add nothing to the 'explicit or implicit' determinations in the judgment." *See Allstate Ins. Co. v. Irwin*, 627 S.W.3d 263, 268 (Tex. 2021) (explaining that "the declaratory relief claim must do 'more than merely duplicate the issues' being litigated by the claims for which fees are unavailable" (quoting *MBM Fin. Corp. v. Woodlands Operating Co.*, 292 S.W.3d 660, 669 (Tex. 2009))). However, the Rural Providers contend that they have pleaded and proven their ultra vires claims upon which their request for UDJA relief is based and that their requested UDJA relief is not redundant of their other claims. Further, they assert that officials in an ultra vires suit are not immune from attorneys' fees under the UDJA, relying on *City of San Antonio v. International Ass'n of Fire Fighters, Local 624*, 582 S.W.3d 455, 467 (Tex. App.—San Antonio 2018, no pet.) (affirming award of attorneys' fees pursuant to UDJA against officials in their official capacities and holding that "a public official does not have

36

governmental immunity from a claim for attorney's fees ancillary to an award of prospective relief in an *ultra vires* action brought under the UDJA").

Neither party has expressly addressed whether the Rural Providers' ultra vires claims seeking UDJA relief could be pursued through another statutory method. "Under the redundant remedies doctrine, courts will not entertain an action brought under the UDJA when the same claim could be pursued through different channels." *Patel v. Texas Dep't of Licensing & Reg.*, 469 S.W.3d 69, 79 (Tex. 2015) (citing *Texas Mun. Power Agency v. Public Util. Comm'n*, 253 S.W.3d 184, 200 (Tex. 2007)). "The focus of the doctrine is on the initiation of the case, that is, whether the Legislature created a statutory waiver of sovereign immunity that permits the parties to raise their claims through some avenue other than the UDJA." *Id.* The relief sought by the Rural Providers under the UDJA against the Commissioners is a declaration establishing the limits of the Commissioners' statutory authority and establishing that the Commissioners' current actions are ultra vires. The PUC Parties do not identify any alternative avenues available to the Rural Providers by which the Legislature created a statutory waiver of sovereign immunity that would allow them to pursue this relief.

The Rural Providers are seeking more than a mere declaratory judgment under the APA that the Commission engaged in ad hoc rulemaking and thus the "rules" it created are void, and their UDJA claim based on the Commissioners' alleged ultra vires acts is not based only on allegations that they acted ultra vires by engaging in improper rulemaking. *See id.* (explaining that "[w]hen a plaintiff files a proceeding that only challenges the validity of an administrative rule, the parties are bound by the APA and may not seek relief under the UDJA because such relief would be redundant"). And this case does not involve a decision in a contested case for which judicial review may be sought under the APA to seek a reversal of the Commission's actions. *See*

*id.* Instead, the Rural Providers seek declarations based on their ultra vires claims against the Commissioners to establish the parameters of the Commissioners' authority under PURA, including the statutory requirements that they fully fund TUSF and promptly disburse from it, and they seek prospective injunctive relief requiring the Commissioners to fully fund TUSF and promptly disburse from it. *See id.* (concluding that because requested declaration sought more than reversal of agency order, APA Section 2001.174 did not provide redundant remedy); *see also* Tex. Civ. Prac. & Rem. Code § 37.002(b) (UDJA's "purpose is to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations"). The APA does not provide any way for the Rural Providers to establish these boundaries on the Commissioners' statutory authority that would then limit them from underfunding TUSF or from using some method other than the current payment hierarchy to pay providers less than their ordered amounts of support. Likewise, any claim under TOMA would only address past actions by the Commission and would not establish limits on its future actions. Accordingly, we conclude that the declaratory judgment that the Rural Providers seek pursuant to the UDJA is not redundant relief and that they have established as a matter of law their entitlement to a declaratory judgment that the Commissioners are acting ultra vires and that PURA requires them to fully fund TUSF and to promptly disburse from it based on the Commission's existing TUSF orders and commitments.

In addition, the Rural Providers request that if we render a declaratory judgment in their favor, we then remand the case to the trial court for a determination of attorneys' fees under the UDJA. *See* Tex. Civ. Prac. & Rem. Code § 37.009 ("In any proceeding under this chapter, the court may award costs and reasonable and necessary attorney's fees as are equitable and just."). Here, because the Rural Providers are entitled to maintain their separate claim for UDJA relief, we conclude that they are not relying on the statute solely as a vehicle to recover attorneys' fees. *See*

38

*Texas State Bd. of Plumbing Exam'rs v. Associated Plumbing-Heating-Cooling Contractors of Tex., Inc.*, 31 S.W.3d 750, 754 (Tex. App.—Austin 2000, pet. dism'd by agr.) (affirming trial court's order that Board must pay attorneys' fees and holding that trial court's construction of statute to determine and declare contract void and to enjoin party from specific action constituted more than mere resolution of challenge to validity of Board's administrative rule and thus UDJA claim was not solely vehicle to recover attorneys' fees). An award of attorneys' fees for successfully pursuing an ultra vires claim under the UDJA is not retrospective monetary relief that would be barred by immunity. Such an award "does not compensate the plaintiff for the injury that first brought him into court. Instead, the award reimburses him for a portion of the expenses he incurred in seeking prospective relief." *International Ass'n of Fire Fighters, Local 624*, 582 S.W.3d at 467 (quoting *Hutto v. Finney*, 437 U.S. 678, 691, 695 n.24, (1978)). Accordingly, the Commissioners do not have immunity from the Rural Providers' claim for attorneys' fees ancillary to the award of prospective relief in this ultra vires suit brought under the UDJA. *See id.* Having determined that the Rural Providers are entitled to prospective relief under the UDJA on their ultra vires claims, we remand their claim for attorneys' fees under the UDJA to the trial court for its consideration.

### 2. Permanent Injunction

The Rural Providers also contend that they have proven their entitlement to a permanent injunction and that the trial court erred by denying their summary-judgment motion seeking this relief. In their summary-judgment motion, they seek a permanent injunction enjoining the Commissioners from:

- Deviating from [the Commission's] existing orders with respect to TUSF disbursements, or from its rules with respect to establishing TUSF funding . . . .

To be entitled to a permanent injunction, a party must prove (1) a wrongful act, (2) imminent harm, (3) an irreparable injury, and (4) the absence of an adequate remedy at law. *Pike v. Texas EMC Mgmt., LLC*, 610 S.W.3d 763, 792 (Tex. 2020). The Rural Providers assert that they have established each element as a matter of law.

We have concluded that the Commissioners acted ultra vires by refusing to fully fund TUSF in the amount necessary to pay for TUSF programs, including the monthly support amounts set by Commission orders, and by prioritizing payments to some TUSF programs over others. These ultra vires acts satisfy the first element of a wrongful act. The second element, imminent harm, has been established by the summary-judgment evidence showing that the Rural Providers had been receiving approximately 30% of the monthly TUSF support amounts to which they are entitled, beginning in January 2021, and that the Commission's own projections were for high-cost support to continue to be short paid indefinitely by at least 65% below the ordered amounts.

As for the third element, irreparable injury, it is undisputed that the Rural Providers established in their Commission proceedings the level of financial support that is required for them to maintain telephone networks in high-cost areas, and that without that support, the continued reliability of telecommunications services to rural Texas will be threatened. In the first month alone after the December 2020 Contract Amendment was executed, the Rural Providers' collective losses were approximately $10 million. The executive director of the Texas Telephone Association and the CEO of the Texas Statewide Telephone Cooperative Inc. testified that on average the association members who participate in TUSF under Commission Rule 26.407 receive

40

about 60% of their intrastate, regulated revenues from TUSF—in other words, more of the revenue that they need to meet their service obligations comes from TUSF than from the rates paid by their rural customers. *See* 16 Tex. Admin. Code § 26.407 (establishing criteria for small incumbent local exchange companies and other eligible telecommunications providers who provide service in small or rural areas to request adjustments to monthly support). And as both the executive director and the CEO attested,

> [t]he rural Texans that live or work in sparsely populated areas and receive service from these member companies and cooperatives thus need TUSF to work as intended so they can retain reasonably priced, reliable basic local telecommunications services. All Texans benefit from sufficient TUSF support, because all of us—urban and rural, rich and poor, business and residential—derive economic and social benefits from being able to communicate with all other Texans on a universal network.

The executive director and the CEO further attested (and the PUC Parties do not dispute) that as the Rural Providers lose this significant portion of the funds they need to operate in high-cost areas, it threatens the providers' solvency and the continued reliability of telecommunications services to rural Texas. The executive director and the CEO explained in their affidavits that as the Rural Providers experience shortfalls in their TUSF disbursements from the Commission,

> they may struggle to meet service obligations, be unable to extend service(s) to all requesting customers, be unable to invest in their networks, and be unable to maintain the costly networks they already have. If they are unable to replace or upgrade their networks into certain areas, customers will suffer. If they lose customers due to such issues, they may never get those customers back. Such harms would affect service immediately, damage the goodwill the providers have built up over decades, and could not be remedied by future payments. Bankrupting the TUSF should thus be expected to in turn bankrupt telecommunication providers who rely on it, which could in turn strand rural Texans without basic local telecommunications services.

41

"An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard." *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002) (analyzing issuance of temporary injunction). The Rural Providers have established that absent the TUSF support needed for them to operate, they will suffer noncompensable, irreparable injuries such as business disruptions, loss of goodwill, and loss of customers.[15] *See Texas Dep't of State Health Servs. v. Holmes*, 294 S.W.3d 328, 334 (Tex. App.—Austin 2009, pet. denied) (addressing irreparable harm in temporary-injunction context).

Finally, the fourth element required for injunctive relief is an inadequate legal remedy.[16] As explained above, monetary damages would not adequately compensate the Rural

---

[15] Although not in evidence before the trial court, amicus briefs received in this appeal provided information that appears illustrative of the irreparable injuries faced by Texans living in remote areas if they no longer have access to affordable telecommunications services. DialToneServices, LP, another TUSF recipient, stated in its amicus brief that it "has approximately 3,000 customers in Texas, one-third of whom are first responders, and individuals and businesses (ranchers and oil-field workers) located in some of the most remote reaches of Texas for whom landline and cellular options are unavailable." It provides its telecommunications service utilizing satellite phones and is the only provider in Texas licensed to provide satellite service and entitled to receive TUSF funds to offset prices for satellite service that most customers could not afford to pay. DialTone stated that it recently advised customers that it must increase its rate from $24.95 per month to $59.25 per month because of the loss of its full TUSF funding. It included a small sample of written responses from its customers expressing their concerns about the increase in rates, including several letters from senior citizens living in remote areas with serious medical conditions and no landlines or cell service. We also received an amicus from two associations representing midsize and rural schools, urging that the loss of the telecommunication services that TUSF has provided to rural areas "would be devastating to rural schools, educators, and students."

In its amicus brief, the Association of Rural Communities in Texas explained that the uncertain future of rural telecommunication providers "could mean longer service times, reliance on outdated equipment, the end of discounted services now being provided to many rural communities, rate increases or ultimately loss of service entirely which would drastically impact rural communities. Moreover, in most rural communities the local phone company is one of the largest employers and a key contributor to the local economic engine. . . . anything that threatens the local phone company could in turn threaten the entire local economy."

[16] The Rural Providers do not have an adequate legal remedy via any administrative proceeding before the Commission. Even if they attempted to file rate cases, their local rates could not be raised to the levels necessary to replace lost TUSF funding because PURA constrains the

Providers for disruption of their business and service to customers or for losses of goodwill and customers, and those damages could not be measured by any certain pecuniary standard. *See Butnaru*, 84 S.W.3d at 211 (noting that party can rarely establish irreparable injury and inadequate legal remedy when monetary damages are available but concluding that trial court did not abuse discretion by concluding no adequate legal remedy was available when dispute involved not only contract dispute for which damages would be available but also involved dispute over right to purchase real property for which *equitable* relief was available); *see also Town of Palm Valley v. Johnson*, 87 S.W.3d 110, 111 (Tex. 2001) (per curiam) (explaining that irreparable injury must be shown because injunctive relief is designed to provide remedy for injuries for which there is not "clear, full, and adequate relief at law"). Accordingly, we conclude that the Rural Providers have established as a matter of law their entitlement to the requested permanent injunction enjoining the Commissioners from not fully funding TUSF as required by statute and from failing to fully pay all disbursements required by PURA and the Commission's existing TUSF orders and commitments.

---

Commission from raising rates above a level "consistent with achieving universal *affordable* service." Tex. Util. Code § 58.060 (emphasis added). The Texas Telephone Association executive director and the Texas Statewide Telephone Cooperative Inc.'s CEO attested that rate cases could not generate enough revenue to replace the monthly funding shortfalls without doubling the local rates (which are the rates the Commission has currently determined are reasonable). In addition, because it takes months to prepare major rate filing applications and typically a year or more to litigate a rate case, even if the Commission were able to litigate the influx of more than 50 rate cases simultaneously in that time frame, by the time the cases were resolved the shortfall in payments would total at least $125 million. The rates would only be set on a going-forward basis, so there would be no remedy at all for the shortfalls incurred while the rate cases were pending.

### 3. Monetary relief

The Rural Providers contend that sovereign immunity does not bar their request for prospective declaratory and injunctive relief for their ultra vires claims, including the payment of money. *See Heinrich*, 284 S.W.3d at 372 ("[S]uits to require state officials to comply with statutory or constitutional provisions are not prohibited by sovereign immunity, even if a declaration to that effect compels the payment of money."); *see also City of Houston v. Houston Mun. Emps. Pension Sys.*, 549 S.W.3d 566, 582 (Tex. 2018) ("Under *Heinrich*, prospective relief is permissible so that statutes specifically directing payment can "'be judicially enforced going forward.'" (quoting *Heinrich*, 284 S.W.3d at 376)). They further assert that on these facts, sovereign immunity also does not bar an injunction providing retroactive monetary relief to enforce the Commission's final orders, with the Windstream and CenturyLink Appellants likening these orders to consent decrees that the United States Supreme Court has recognized may be enforced from the decree's inception without violating sovereign immunity. *See Heinrich*, 284 S.W.3d at 376 (stating that rule prohibiting retrospective remedies against state officials "is not absolute"); *see also Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 439 (2004) (holding that enforcing consent decree to which state officials had agreed and which "is a federal-court order that springs from a federal dispute and furthers the objectives of federal law" and creates "a mandatory, enforceable obligation" does not violate Eleventh Amendment's provision of immunity for state officials). While the PUC Parties do not dispute that prospective injunctive relief is available on ultra vires claims, they argue that when discussing circumstances in which retrospective relief might be available, *Heinrich* only referred to takings claims and claims for which the state (as opposed to state officials) cannot invoke its immunity, not to ultra vires claims.

44

*Heinrich* is clear that the rule is "that a claimant who successfully proves an *ultra vires* claim is entitled to prospective injunctive relief, as measured from the date of injunction," but not to retrospective remedies, outside of the takings context or in a situation in which the claim against the state is not barred by immunity. *Heinrich*, 284 S.W.3d at 376. Accordingly, sovereign immunity does not bar the prospective injunctive relief that we hold is appropriate in this case. The Rural Providers urge that because this Court is to enter the judgment that the trial court should have rendered, our prospective injunction should run from the June 7, 2021 date of the trial court's judgment. To award injunctive relief dating back to June 7, 2021, however, would necessarily be to grant retrospective relief, which we cannot do.

The Windstream and CenturyLink Appellants urge that in this unusual situation in which the Commission has previously determined the monthly support amounts that the Rural Providers are owed, we should enforce those orders from their inception, as the Supreme Court has determined may be done with consent decrees. *See Frew*, 540 U.S. at 439. While the Commission's final orders on their face seem similar to consent decrees in the sense that the Rural Providers' proceedings before the Commission were resolved by the consent of all parties to the proceeding, the United States Supreme Court's holding in *Frew* did not change the general rule in federal court, similar to the rule expressed in *Heinrich*, that suits for prospective injunctive relief against state officials acting in violation of federal law do not violate the Eleventh Amendment's prohibition of suits against the individual states. *See Frew*, 540 U.S. at 437. Instead, the Supreme Court concluded that because the decree was a federal-court order designed to further the objectives of a federal law, even though the decree required the state to implement specific procedures that were more detailed than the general mandate of the federal law, the party seeking to enforce the decree was not required to establish a violation of the federal law by state officials

45

to be able to enforce the more specific decree provisions. *See id.* at 436-37, 439 (holding that decree was enforceable under principles expressed in *Ex parte Young*, 209 U.S. 123 (1908), and "enforcing the decree vindicates an agreement that the state officials reached to comply with federal law"). The Supreme Court explained that the consent decree was an exercise of the federal courts' power under *Ex parte Young* and *Edelman v. Jordan*, 415 U.S. 651 (1974), to issue prospective injunctions, and that "[f]ederal courts are not reduced to approving consent decrees and hoping for compliance." *Id.* at 440. We do not read *Frew* as authorizing this Court to award retrospective relief for state officials' violations of state law or agency orders. Instead, as the Texas Supreme Court stated in *Heinrich*, "the Legislature is best positioned to waive immunity, and it can authorize retrospective relief if appropriate. There are cases in which prospective relief is inadequate to make the plaintiff whole, but the contours of the appropriate remedy must be determined by the Legislature." 284 S.W.3d at 377.

### 4. Mandamus

The Rural Providers also challenge the trial court's denial of the mandamus relief requested in their summary-judgment motion, arguing that they have established their entitlement to such relief as a matter of law. The Rural Providers requested that the trial court issue a writ of mandamus to the Commissioners requiring them "to enforce their orders, fulfill their duty imposed by law to adequately fund all TUSF programs and make all required disbursements." The PUC Parties do not directly address this request for relief. They generally argue that the remedies sought by the Rural Providers are unconstitutional because they would ask this Court to enter an order the Commission declined to enter and would require this Court to define the terms of a final Commission order.

46

We disagree. In cases alleging ultra vires conduct that amounts to governmental inaction, "a court may issue a writ of mandamus compelling action to bring the official into conformance with the law." *Houston Mun. Emps. Pension Sys.*, 549 S.W.3d at 576. The writ of mandamus requested by the Rural Providers would not dictate the terms of a final Commission order; instead, it would require the Commissioners to enforce pre-existing final Commission orders requiring the payment of TUSF support. As we concluded above, the Commissioners have discretion about how they choose to fully fund TUSF, but they have no discretion about *whether* to fully fund TUSF. *See id.* at 582.

A district court has the authority to issue writs of mandamus. *See* Tex. Gov't Code § 24.011. An original proceeding for a writ of mandamus initiated in the trial court is a civil action subject to trial and appeal on issues of substantive law and under the same procedural rules as any other civil suit. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 795 n.1 (Tex. 1991). In a common-law proceeding, there are three prerequisites to obtaining a writ of mandamus: a legal duty to perform a nondiscretionary act, a demand for performance of the act, and a refusal to perform. *Dallas Fort Worth Int'l Airport Bd. v. Cox*, 261 S.W.3d 378, 382 (Tex. App.—Dallas 2008, no pet.) (citing *Texas Dep't of Public Safety v. Gilbreath*, 842 S.W.2d 408, 413 (Tex. App.—Austin 1992, no pet.)). In this case, the Rural Providers' request for mandamus is based on the Commissioners' refusal to fully fund TUSF and to make the monthly support payments required by the Commission's final orders. We have concluded that the Commissioners have a legal duty to perform these acts. After the Commissioners decided not to raise the TUSF assessment rate in June 2020 and directed staff to work with Solix to create a payment hierarchy, the Rural Providers filed a motion for reconsideration, which the Commission ignored, and a petition for rulemaking, which the Commission denied. The Commission's subsequent implementation of the 2020

47

Contract Amendment's payment hierarchy and partial monthly payments to the Rural Providers establishes its refusal to perform. Consequently, we conclude that the Rural Providers have established as a matter of law that the trial court should have granted their petition for writ of mandamus.

## II.    APA-Rulemaking Claims

The Rural Providers assert on appeal that the trial court erred by denying their summary-judgment motion and granting the PUC Parties' combined motion and plea because both the Commission's June 2020 decision (to allow TUSF to become insolvent and to triage TUSF with a payment hierarchy) and the December 2020 Contract Amendment (implementing that payment hierarchy) constitute "rules" under the APA that are invalid because the Commission failed to comply with the APA's rulemaking requirements. *See* Tex. Gov't Code § 2001.038(a) (allowing declaratory-judgment suit to determine validity or applicability of agency rule "if it is alleged that the rule or its threatened application interferes with or impairs, or threatens to interfere with or impair, a legal right or privilege of the plaintiff"). They request that we declare invalid and enjoin the Commission's enforcement of the June 2020 decision and December 2020 Contract Amendment. In other words, they ask that we reverse the dismissal of their APA rulemaking claim and render the relief requested in their summary-judgment motion: (1) a declaratory judgment that the Commission's June 2020 decision to allow TUSF to become insolvent is void as an ad hoc rule and that the Contract Amendment implementing a payment hierarchy is void as an ad hoc rule and (2) a permanent injunction prohibiting the Commission from enforcing the December 2020 Contract Amendment, which was executed in violation of the APA. In response, the PUC Parties

primarily contend that the December 2020 Contract Amendment is not a rule but instead is merely a "guideline" and thus is not subject to a challenge under Section 2001.038 of the APA.[17]

A rule is invalid when an agency promulgates it without complying with the proper rulemaking procedures. *El Paso Hosp. Dist. v. Texas Health & Human Servs. Comm'n*, 247 S.W.3d 709, 715 (Tex. 2008) (citing Tex. Gov't Code § 2001.035(a)); *see generally* Tex. Gov't Code §§ 2001.001-.038. These procedures include providing notice, publication, and public comment on the proposed rule. *Rodriguez*, 997 S.W.2d at 255 (citing Tex. Gov't Code §§ 2001.023-.030). This process ensures notice to the public and affected persons and an opportunity to be heard on matters that affect them. *Id.* The APA states that a "rule":

(A) means a state agency statement of general applicability that:

    (i)      implements, interprets, or prescribes law or policy; or

    (ii)     describes the procedure or practice requirements of a state agency;

---

[17] The PUC Parties also contend that the Rural Providers' claim that the Commission violated the APA by deciding not to fully fund TUSF is barred by sovereign immunity because "the APA does not provide a right to judicial review of an agency's refusal to adopt rules," *Texas Comm'n on Env'tl Quality v. Bonser-Lain*, 438 S.W.3d 887, 894 (Tex. App.—Austin 2014, no pet.), or of procedures an agency employed before it decided not to adopt a rule, *Kidd v. Texas Pub. Util. Comm'n*, 481 S.W.3d 388, 389-90, 394 (Tex. App.—Austin 2015, no pet.). This argument fails because the Rural Providers do not assert that the Commission refused to adopt rules or complain about the prior procedure—instead, they assert the Commission adopted new rules and implemented a new procedure without following the APA's rulemaking requirements. In addition, the PUC Parties argue that any other APA challenge by the Rural Providers is barred by sovereign immunity because they have failed to exhaust their administrative remedies by not initiating a complaint proceeding "to initiate an inquiry into any aspect of the administration of the TUSF." 16 Tex. Admin. Code § 26.420(c)(3) (allowing Commission "on its own motion, upon the petition of the commission staff or the Office of Public Utility Counsel" to initiate such inquiry and allowing any other party to initiate complaint proceeding pursuant to Commission's procedural rules). However, the Rural Providers raise no other APA challenge, and there is no requirement to exhaust administrative remedies before bringing a Section 2001.038(a) challenge. *See* Tex. Gov't Code § 2001.038(d) ("A court may render a declaratory judgment without regard to whether the plaintiff requested the state agency to rule on the validity or applicability of the rule in question.").

(B) includes the amendment or repeal of a prior rule; and

(C) does not include a statement regarding only the internal management or organization of a state agency and not affecting private rights or procedures.

Tex. Gov't Code § 2001.003(6).

In this case, the Rural Providers have alleged that the June 2020 decision and December 2020 Contract Amendment are invalid because they amended or repealed several existing rules without following the APA's rulemaking procedures and that the actions impair or threaten to impair their legal rights to payment of the ordered TUSF support amounts. *See id.* § 2001.038(a). The facts surrounding the June 2020 decision and the December 2020 Contract Amendment are undisputed, including the fact that the APA's rulemaking procedures were not followed when the PUC Parties took these actions. Thus, the key summary-judgment issue is whether those two acts qualify as "rules" as defined by the APA. If they do, then the Rural Providers' claims under APA Section 2001.038(a) both invoke the trial court's subject-matter jurisdiction and establish their entitlement to summary judgment. *See Teladoc, Inc. v. Texas Med. Bd.*, 453 S.W.3d 606, 613-14 (Tex. App.—Austin 2014, pet. denied).

The Rural Providers contend that the two acts satisfy each element of the APA's definition of a "rule." The PUC Parties do not dispute that the Contract Amendment is a "state agency statement." Tex. Gov't Code § 2001.003(6)(A). It plainly "purports to speak for the [Commission], conveying its official position," and the PUC Parties not only do not dispute but in fact affirmatively pleaded and argued that the Commission's executive director, who executed the Amendment, acted with "full authority." *Teladoc*, 453 S.W.3d at 614. Also, both the June 2020 decision to not fully fund TUSF for the first time and to triage the dwindling TUSF and the

50

December 2020 Contract Amendment setting forth the mechanics of the previously nonexistent triage system unquestionably "implement[], interpret[], or prescribe[] law or policy" and describe Commission procedure. *See* Tex. Gov't Code § 2001.003(6)(A)(i)-(ii).

The PUC Parties assert that the December 2020 Contract Amendment does not meet the definition of a "rule" but instead is a "guideline[] established by the [C]ommission in its contract with the TUSF administrator" for how to administer TUSF in the event of a shortfall, implying that it is only a statement concerning the internal management of the agency, which would exempt it from the definition.**18** *See* 16 Tex. Admin. Code § 26.420(d)(2) (setting forth duties of TUSF administrator); *see also* Tex. Gov't Code § 2001.003(6)(C). We disagree.

"[T]he core concept" in distinguishing between an agency statement that concerns only "internal management" and a "rule" is whether the agency statement has "a binding effect on private parties." *See Texas State Bd. of Pharmacy v. Witcher*, 447 S.W.3d 520, 529 (Tex. App.—Austin 2014, pet. denied) (quoting *Slay v. Texas Comm'n on Env'tl Quality*, 351 S.W.3d 532, 546 (Tex. App.—Austin 2011, pet. denied)). "[T]o constitute a "rule" under [the APA] definition, 'an agency statement interpreting law must bind the agency *or otherwise represent its authoritative position in matters that impact personal rights*.'" *Id.* (quoting *Sunset Transp., Inc.*, 357 S.W.3d at

---

**18** The PUC Parties contend that the Rural Providers may not argue on appeal that the Commission's June 2020 decision to not collect the needed amount of money to fully fund TUSF is an invalid rule because they did not adequately assert this argument in the trial court, and thus, the PUC Parties do not address whether the June 2020 decision is a "rule" as defined by the APA. The Rural Providers pleaded that the June decision and the Contract Amendment effectively amend or repeal prior Commission rules and orders and that "[o]ral decisions such as the June 12 Decision are prohibited in setting or amending agency rules." They asserted in their summary-judgment motion that "[t]he Commission's refusal to set a sufficient assessment rate and the contract amendment violate the APA." We conclude that they sufficiently raised this point below, and accordingly, we will consider whether the June 2020 decision is a "rule." *See* Tex. R. App. P. 33.1.

51

703 (emphasis added in *Witcher*)). The June 2020 decision not to fully fund TUSF and to implement a payment hierarchy and the December 2020 Contract Amendment implementing the payment hierarchy are without question agency statements implementing Commission policy and describing Commission procedure that affects the private rights of the Rural Providers and all eligible telecommunications providers, as well as having "general applicability" that affects the interests of the public at large.[19] *See El Paso Hosp. Dist.*, 247 S.W.3d at 714 (explaining that statements of "general applicability" "affect the interest of the public at large such that they cannot be given the effect of law without public input" (quoting *Railroad Comm'n of Tex. v. WBD Oil & Gas Co.*, 104 S.W.3d 69, 79 (Tex. 2003))). As previously described, by underfunding TUSF and not paying the full amounts of ordered TUSF support, the PUC Parties have affected the Rural Providers' financial stability and ability to continue providing services in high-cost rural areas.

We also disagree with the PUC Parties' assertion that the Contract Amendment does not amend or repeal any of the Commission's prior rules or orders because TUSF is still providing support to eligible telecommunications providers. *See* Tex. Gov't Code § 2001.003(6)(B). The June 2020 decision and the December 2020 Contract Amendment both

___

[19] There is evidence in the summary-judgment record of high interest from the Legislature and concern about the effect of the TUSF shortfall on the legislators' constituents. The evidence includes numerous letters from Texas legislators to the Commission asking for action on the TUSF shortfall, as well as questions and concerns expressed during recorded public hearings about the shortfall's impact on Texans. In addition, in this appeal, we have received nine amicus briefs from seven different entities or groups, including a bipartisan group of 29 state senators and representatives, the Texas Association of Midsize Schools (which includes over 200 school districts with between 1,600 and 5,000 students, many of whom are in rural Texas) and the Texas Association of Rural Schools (over 300 rural school districts), the Association of Rural Communities in Texas, two other TUSF providers, and a law professor. As the amicus brief from the bipartisan group of legislators points out, "TUSF's rural programs directly impact telecommunications services across at least 55% of the state's geography, which in turn impacts connectivity for all citizens across the entire State."

effectively amend or repeal several prior rules. As discussed above, PURA and the Commission's rules require it:

- to fully fund TUSF, *see* 16 Tex. Admin. Code § 26.420(e)(1)-(2);

- to implement a competitively neutral mechanism by which all Texas residents may obtain basic telecommunications services and to determine which providers qualify to receive funds from TUSF to allow them to provide service at reasonable rates in high-cost areas, *see id.* §§ 26.401(a), .420(g)(1); *see also* Tex. Util. Code § 51.001(c), (e), (g); *id.* § 56.023;

- to disburse those funds promptly and efficiently, *see* Tex. Util. Code § 56.026; and

- to follow specific procedures to adjust the amount of TUSF support a provider receives, *see* 16 Tex. Admin. Code §§ 26.403(e), .404(f), .405, .407; *see also* Tex. Util. Code §§ 56.031, .032(b).

While TUSF is still providing approximately 30% of the ordered support to the providers, the PUC Parties implemented this reduction in support without compliance with PURA and the existing rules. Thus, the June 2020 decision and the Contract Amendment have "legal effect or significance independent of what is already contained" in these existing rules and constitute an amendment or repeal of these rules. *See Teladoc*, 453 S.W.3d at 615. Accordingly, we hold as a matter of law that the June 2020 decision and the Contract Amendment are rules under the APA, meaning that the Rural Providers' Section 2001.038 claims both invoke the trial court's subject-matter jurisdiction and establish their entitlement to summary judgment. *See Teladoc*, 453 S.W.3d at 613-14, 623. We reverse the trial court's dismissal of these claims. We will render judgment granting the Rural Providers' summary-judgment motion, including their requested relief of (1) a declaratory judgment that the Commission's June 2020 decision and the December 2020 Contract Amendment are void and (2) a permanent injunction prohibiting the

53

Commission and its Commissioners from enforcing the December 2020 Contract Amendment; *El Paso Hosp. Dist. v. Texas Health & Human Servs. Comm'n*, 247 S.W.3d 709, 715 (Tex. 2008) (rendering judgment declaring rule invalid under APA Section 2001.038 and enjoining its enforcement); *see also Texas Dep't of State Health Servs. v. Balquinta*, 429 S.W.3d 726, 750 (Tex. App.—Austin 2014, pet. dism'd) (finding claim for injunctive relief under APA Section 2001.038 was properly directed against agency and finding "no harmful error, if any error, in the district court's assertion of jurisdiction over the claims for injunctive relief to the extent they are also addressed, as a formal matter, to the Commissioner in his official capacity").[20]

---

[20] The Rural Providers also urge us to reverse the dismissal of their request for mandamus relief made in connection with their rulemaking claim. To the extent they requested mandamus relief in connection with this claim, we affirm the trial court's denial of this request. They requested a writ of mandamus "ordering [the PUC Parties] to fulfill their duty imposed by law to adequately fund all TUSF programs and make all required disbursements; and that Defendants' actions in violation of [TOMA] are void." We conclude that a writ ordering the Commission to fulfill the PUC Parties' duty imposed by law to fully fund TUSF and to comply with existing disbursement orders is not appropriate relief for the Rural Providers' rulemaking claim. The Rural Providers have not alleged a legal duty to perform a nondiscretionary *rulemaking* act, a demand for performance of the act, and a refusal to perform. *See Dallas Fort Worth Int'l Airport Bd. v. Cox*, 261 S.W.3d 378, 382 (Tex. App.—Dallas 2008, no pet.) (citing *Texas Dep't of Public Safety v. Gilbreath*, 842 S.W.2d 408, 413 (Tex. App.—Austin 1992, no pet.)). Instead, the Rural Providers' request is premised on the nondiscretionary legal duty to fully fund TUSF and comply with existing Commission orders, which we have addressed in connection with the Rural Providers' ultra vires claim and request for UDJA relief against the Commissioners. And to the extent that the Rural Providers' request for APA mandamus relief can be read as a request for a writ ordering that the June 2020 decision and the December 2020 Contract Amendment are void, we conclude that such a writ is not necessary because we are rendering a declaratory judgment under the APA that those actions are void.

In addition, because we have sustained the Rural Providers' APA issue and granted most of the requested relief, we need not reach the Rural Providers' issue challenging the trial court's ruling on their TOMA claim. *See* Tex. R. App. P. 47.1. The relief requested for the TOMA claim overlaps with the relief requested for the APA-rulemaking claim but is more narrow in scope. The Rural Providers requested a permanent injunction prohibiting the Commission from enforcing the December 2020 Contract Amendment and a writ of mandamus against the PUC Parties ordering the Commission to void the December 2020 Contract Amendment because they allege it was executed in violation of TOMA.

54

## III. Takings Claim

The Rural Providers challenge the trial court's denial of their summary-judgment motion and grant of the PUC Parties' combined summary-judgment motion and plea to the jurisdiction on their takings claim. They argue that the June 2020 decision and December 2020 Contract Amendment were unconstitutional takings of private property without just compensation, consistent with their allegation in the trial court that the PUC Parties' actions to deny TUSF support to the Rural Providers "interferes with the investment-backed expectations in owning and operating a telecommunications company in Texas." *See Hallco Tex., Inc. v. McMullen County*, 221 S.W.3d 50, 56 (Tex. 2006) (setting forth factors to be considered when determining whether regulatory action constitutes "taking," including extent to which the regulation has interfered with distinct investment-backed expectations).

Article I, Section 17 of the Texas Constitution provides that "[n]o person's property shall be taken, damaged or destroyed or applied to public use without adequate compensation being made . . . ."[21] Sovereign immunity "does not shield the State from an action for compensation under the takings clause." *General Servs. Comm'n v. Little-Tex Insulation Co.*, 39 S.W.3d 591, 598 (Tex. 2001). Plaintiffs seeking recovery for a taking generally "must prove the government 'intentionally took or damaged their property for public use, or was substantially certain that would be the result.'" *Harris Cnty. Flood Control Dist. v. Kerr*, 499 S.W.3d 793, 799 (Tex. 2016)

---

[21] The Rural Providers do not explicitly state whether they bring their takings claim under the Texas Constitution or the United States Constitution or both, and no party argues that their relief would differ under either provision. Although our takings provision is worded differently than the Takings Clause of the Fifth Amendment to the United States Constitution, the Texas Supreme Court has described it as "comparable," and courts typically look to federal cases for guidance. *See Hallco Tex., Inc. v. McMullen County*, 221 S.W.3d 50, 56 (Tex. 2006); *see also* U.S. Const. amend. V ("[N]or shall private property be taken for public use, without just compensation.").

(quoting *City of Keller v. Wilson*, 168 S.W.3d 802, 808 (Tex. 2005)).  Determining whether a particular regulatory action constitutes a "taking" is an "ad hoc, factual inquir[y]" that "depends largely 'upon the particular circumstances [in that] case.'" *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978) (quoting *United States v. Central Eureka Mining Co.*, 357 U.S. 155, 168, (1958), and noting that court "has been unable to develop any 'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons").  While both physical possession or invasion and regulation that deprives a property owner of all economically beneficial or productive use of the property are categorically "takings," "[l]esser interferences . . . may also result in a taking." *Hallco*, 221 S.W.3d at 56.

When analyzing whether regulatory action has gone "so far in imposing public burdens on private interests as to require compensation. . . . we carefully weigh 'all the relevant circumstances,'" including these guiding factors first identified in *Penn Central*:

(1) "the economic impact of the regulation on the claimant;"

(2) "the extent to which the regulation has interfered with distinct investment-backed expectations;" and

(3) "the character of the governmental action."

*Id.* (quoting *Sheffield Dev. Co. v. City of Glenn Heights*, 140 S.W.3d 660, 670-72 (Tex. 2004) for list of factors).  While the factfinder resolves any disputed facts about the extent of the governmental intrusion, "the ultimate determination of whether the facts are sufficient to constitute a taking is a question of law." *Sheffield*, 140 S.W.3d at 673 (quoting *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 933 (Tex. 1998)).

56

In this case, the PUC Parties do not contend that there are any disputed fact issues about the extent of the governmental intrusion. The Rural Providers contend, and the PUC Parties do not dispute, that the summary-judgment evidence establishes the first two *Penn Central* factors. For the first factor, economic impact of the regulation on the claimant, the Rural Providers submitted summary-judgment evidence demonstrating that the impact of the PUC Parties' decision not to fully fund TUSF and directing Commission staff to instead formulate a payment hierarchy, followed by the Contract Amendment implementing that payment hierarchy, has deprived the Rural Providers of approximately 60%-70% of their ordered funding, collectively amounting to millions of dollars in Commission-ordered monthly support amounts. Both the executive director of the Texas Telephone Association and the CEO of the Texas Statewide Telephone Cooperative Inc. attested that "[a]llowing the Fund to run out threatens the solvency of the telecommunications providers that rely upon those funds and the continued reliability of telecommunications services to rural Texas."

For the second factor, the extent to which the regulation has interfered with distinct investment-backed expectations, the nonpayment of the ordered TUSF support amounts unquestionably interferes with the Rural Providers' investment-backed expectations. One of the main purposes of TUSF is to "assist telecommunications providers in providing basic local telecommunications service at reasonable rates in high cost rural areas." Tex. Util. Code § 56.021(1). PURA and the Commission's rules establish the process by which the providers must prove to the Commission their need for continued support to recoup their investments and to maintain their networks and continue providing service in high-cost rural areas at rates comparable to urban-area rates. *See, e.g.*, 16 Tex. Admin. Code § 26.405 (establishing criteria for providers to demonstrate financial need for continued support). The expectation of the Rural Providers when

they began providing service in the high-cost areas and engaged in Commission proceedings setting their monthly support amounts was that the Commission would abide by PURA and its own rules and orders to provide support that would make that service economically feasible. Both the executive director of the Texas Telephone Association and the CEO of the Texas Statewide Telephone Cooperative Inc. attested to the expense of installing and maintaining the telecommunications network "in sparsely populated areas where facilities must travel longer distances to reach fewer customers" and further attested that it would not be economically feasible to cover the costs of building and maintaining the network in those areas without full TUSF funding. When the Telecom Providers invested in high-cost rural networks, they did so with the expectation that they would receive the full amount of their Commission-ordered TUSF funding. *Cf. Railroad Comm'n v. Houston Nat. Gas Corp.*, 289 S.W.2d 559, 563 (Tex. 1956) (noting two United States Supreme Court cases had "settled the proposition that the owner of property used in the public interest as a public utility is as a matter of law entitled not only to keep all of the property that he starts out with but also to make a return as income upon his property").

The PUC Parties challenge only whether the Rural Providers have established the third factor, the character of the governmental action. They argue that "the relevant government action is the [Commission's] inaction on its staff's recommendation that the PUC double the assessment rate" and that governmental "inaction cannot give rise to a taking," citing *Kerr*, 499 S.W.3d at 799. It is true that "[o]nly affirmative conduct by the government will support a takings claim," and "[a] government cannot be liable for a taking if 'it committed no intentional acts.'" *Id.* at 800 (quoting *City of Tyler v. Likes*, 962 S.W.2d 489, 505 (Tex. 1997)). The PUC Parties characterize what happened at the June 2020 meeting as the Commissioners taking no action after discussion. Leaving aside the fact that no decision often is a decision, this is not a case

58

in which the Commissioners merely neglected to take action, or where, as in *Kerr*, the governmental entity had never fully implemented a plan that was to be implemented in phases, *see id.* at 796. In this case, the summary-judgment evidence shows that the PUC Parties made a decision, made a plan to implement that decision, and executed that plan via the Contract Amendment. The Commissioners discussed at length at the June open meeting the "very hard decision" they had to make, the options before them, and determined that they should "leave the Fund as it is but to direct Staff and Jay Stone, in particular, to begin paying out of the Fund to only fund Lifeline projects so that those continue to be funded but to leave everything else as is." Faced with TUSF's impending insolvency, the PUC Parties made a conscious decision to "ask Staff to get with Solex [sic] and figure out a way to triage" which programs the Commission could afford to fully fund without raising the rate and which it would have to underfund if it did not raise the rate. In addition, the December 2020 Contract Amendment is an affirmative act undertaken by the PUC Parties to implement the triage system, which they knew would result in underpayment of the ordered monthly support amounts owed to the Rural Providers.[22] We conclude that the summary-judgment evidence establishes that the PUC Parties took affirmative regulatory action that has had a negative economic impact on the Rural Providers and has interfered with their investment-backed expectations.

Courts have raised other concerns when considering this third factor. In *Penn Central*, in considering the "character of the governmental action," the United States Supreme Court noted that "[a] 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government . . . than when interference arises from some

---

[22] The PUC Parties do not advocate any reason why the Contract Amendment is governmental inaction, rather than action. They make no argument at all for why it is not a taking.

59

public program adjusting the benefits and burdens of economic life to promote the common good." 438 U.S. at 124 (citation omitted). The court discussed the wide variety of contexts in which it is permissible for government to execute laws or programs that adversely affect recognized private economic values, including exercises of the taxing power, certain land-use regulations, and acquisitions of resources to permit or facilitate uniquely public functions, but it also identified some factually based parameters for when the government's efforts to further important public policies have so "frustrate[d] distinct investment-backed expectations as to amount to a 'taking.'" *Id.* at 124-28. In *Palazzolo v. Rhode Island*, 533 U.S. 606 (2001) (O'Connor, J., concurring), Justice O'Connor expounded on the *Penn Central* analysis, noting that "[t]he purposes served, as well as the effects produced, by a particular regulation inform the takings analysis." *Id.* at 634 (citing *Penn Central*, 438 U.S. at 127). In this case, while the PUC Parties' regulatory actions prevented an increase in the per-customer charge, they undermined the statutory purpose of supporting high-cost rural service, which the Legislature has identified as an important public policy goal. In *Sheffield*, when discussing this factor, the Texas Supreme Court considered whether the regulatory action was general in character or exclusively directed at the plaintiff. 140 S.W.3d at 678. Here, the PUC Parties specifically identified which programs they would continue to fully fund with TUSF and which programs they would underfund. These other considerations also favor a conclusion that the PUC Parties' actions constitute a taking.

In addition, the *Penn Central* factors are "important guideposts that lead to the ultimate determination whether just compensation is required," *Palazzolo*, 533 U.S. at 634, but they are not the only relevant factors to consider, *Sheffield*, 140 S.W.3d at 672. The constitutional guarantee prohibiting the taking of private property for public use without just compensation is "designed to bar Government from forcing some people alone to bear public burdens which, in all

60

fairness and justice, should be borne by the public as a whole." *Penn Central*, 438 U.S. at 123-24 (quoting *Armstrong v. United States*, 364 U.S. 40, 49 (1960)). Our analysis of whether a taking has occurred thus "'necessarily requires a weighing of private and public interests' and a 'careful examination and weighing of all the relevant circumstances in this context.'" *Sheffield*, 140 S.W.3d at 672 (first quoting *Agins v. City of Tiburon*, 447 U.S. 255, 261 (1980), *abrogated on other grounds by Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 540-48 (2005); and then quoting *Tahoe–Sierra Pres. Council, Inc., v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 326 n.23 (2002)). In this case, we consider it relevant that the PUC Parties acted ultra vires, violated PURA's rulemaking requirement, and essentially abdicated their responsibility to carry out the Legislature's stated policy of supporting telecom providers who provide an essential service to Texans. We conclude that the Rural Providers have established as a matter of law that the PUC Parties' regulatory actions have gone "so far in imposing public burdens on private interests as to require compensation. . . ."[23] *Hallco*, 221 S.W.3d at 56.

Accordingly, we reverse the dismissal of the Rural Providers' regulatory-taking claim and render judgment granting their summary-judgment motion as to this claim. Because the

---

[23] The Windstream and CenturyLink Appellants also argue on appeal that the PUC Parties have violated the state and federal Takings Clauses because their actions have compelled the Rural Providers to serve the public for a charge that "is so 'unjust' as to be confiscatory." *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 307 (1989) (holding that state scheme of utility regulation did not take property and declining to adopt "a single theory of valuation as a constitutional requirement"); *see also State Farm Lloyds v. Rathgeber*, 453 S.W.3d 87, 104 (Tex. App.—Austin 2014, pet. granted, judgm't vacated, & remanded by agreement) (considering in rate appeal whether rate's "end result effects a reasonable balancing of insurer and investor interests relative to ratepayer or broader public interests" because such a rate "cannot properly be attacked as confiscatory"). The PUC Parties urge that the Rural Providers have waived this argument because it was not asserted below. We have resolved this issue based on the parties' arguments concerning regulatory takings, and consequently, we need not consider whether the PUC Parties' actions amount to a confiscatory taking or whether that argument was waived. *See* Tex. R. App. P. 47.1.

injunctive relief that we are granting for other claims does not address TUSF arrearages owed to the Rural Providers, we remand this claim to the trial court for a determination of the actual damages resulting from the regulatory taking.

## CONCLUSION

Based on our resolution of the Rural Providers' issues challenging the trial court's rulings on their ultra vires claims and their APA-rulemaking claims, we reverse the trial court's dismissal of these claims and render judgment as follows. The Rural Providers have established as a matter of law that they are entitled to:

(1) A declaratory judgment under the UDJA stating that the Commissioners are acting ultra vires by (i) not fully funding TUSF, (ii) implementing a hierarchy of funding among TUSF programs and enforcing the December 17, 2020 Contract Amendment, and (iii) failing to fully pay all disbursements required by PURA and the Commission's existing TUSF orders and commitments.

(2) A declaratory judgment under the APA, Tex. Gov't Code § 2001.038(a), stating:

   (a) the Commission's June 2020 decision to not fully fund TUSF and to initiate the creation of a hierarchy of funding among TUSF programs is void and

   (b) the December 2020 Contract Amendment is void.

(3) A permanent injunction enjoining:

   (a) the Commissioners from not fully funding TUSF as required by statute and from failing to fully pay all disbursements required by PURA and the Commission's existing TUSF orders and commitments and

   (b) the Commission and the Commissioners from enforcing the December 2020 Contract Amendment.

Further, we conclude that the Rural Providers have demonstrated that they are entitled to have the trial court issue a writ of mandamus based on their ultra vires claims.[24] On remand, the trial court shall issue a writ of mandamus ordering the Commissioners to take immediate action to fulfill their duties imposed by law to fully fund all TUSF programs and to make all disbursements required by PURA and the Commission's existing TUSF orders and commitments. We also reverse the dismissal of the Rural Providers' regulatory-taking claim and render judgment granting their summary-judgment motion as to this claim. We remand to the trial court the regulatory-takings claim for a determination of actual damages and their claim for attorneys' fees under the UDJA. We affirm the trial court's dismissal of the Rural Providers' request for mandamus relief in connection with their APA-rulemaking claim.

_____

Gisela D. Triana, Justice

Before Chief Justice Byrne, Justice Triana, and Justice Kelly

Affirmed in Part; Reversed and Rendered in Part; Reversed and Remanded in Part

Filed: June 30, 2022

---

[24] *See* Tex. Gov't Code § 22.221 (establishing power of courts of appeals to issue writs of mandamus against certain judges); *id.* § 24.011 (establishing district courts' power to grant writs of mandamus).

63